785 A.2d 25 (2001)
345 N.J. Super. 294
Lorraine L. HOLDSWORTH, Executrix and Administratrix Ad Prosequendum of the Estate of Joseph J. Lazarich, Deceased, Plaintiff-Appellant,
v.
Dr. Leonard GALLER, Defendant-Respondent, and
Dr. M. Troum, and A. Horstman, Defendants.
Superior Court of New Jersey, Appellate Division.
Argued October 17, 2001.
Decided November 20, 2001.
*27 Donald G. Targan, Atlantic City, argued the cause for appellant (Mr. Targan, attorney; Michael J. Pender, on the brief).
Jay J. Blumberg, Absecon, argued the cause for respondent (Blumberg & Linder, attorneys; Michael D. Lindner, Jr., Woodbury, on the brief).
Before Judges RODRIGUEZ, LEFELT and LISA.
*26 The opinion of the court was delivered by
LEFELT, J.A.D.
Joseph Lazarich had a two-centimeter cancerous tumor on the left side of his colon. Unfortunately, defendant surgeon Leonard Galler erroneously performed right-sided colon surgery to remove the tumor. Once the doctor recognized the error, he performed the required left-sided abdominal surgery three days later. Lazarich developed complications and died six weeks thereafter.
Plaintiff Lorraine Holdsworth, individually and on behalf of her father's estate, sued Dr. Galler; Dr. Richard Troum, the treating gastroenterologist; and nurse Ann Horstman. The jury found the nurse not negligent but rendered a verdict in favor of plaintiff and against Dr. Galler and Dr. Troum. Plaintiff appealed, contending that Scafidi v. Seiler, 119 N.J. 93, 108-09, 574 A.2d 398 (1990), should not have been charged by the trial judge and should not have been applied to reduce the damages. We agree and reverse and remand.

I.
These are the relevant facts and pertinent procedural history. At the first surgery on the patient's right side, Dr. Galler removed the end of Lazarich's small intestine, his entire right colon and the majority of his transverse colon. Approximately forty to forty-five percent, or over two feet, of the colon was removed by Dr. Galler. The first surgery was performed on the patient's wrong side. Consequently, three days later Lazarich had to undergo another surgery, this time on his left side, after which he was left with approximately twenty-percent of his colon. Because of swelling from the first surgery, Dr. Befeler, plaintiff's medical expert, explained that the second surgery was more difficult and time consuming. The first operation took approximately fiftytwo minutes, and the second surgery approximately an hour and forty minutes. Lazarich's wound was never completely closed after the second surgery and the nurses reported seeing a portion of his bowel through the wound. Lazarich never left the hospital and died six weeks after the second surgery.
The jury awarded plaintiff $40,000 for Lazarich's three days of pain and suffering related to the first unnecessary surgery. This portion of the verdict is not challenged on appeal. The jury also awarded plaintiff $250,000 in survival act damages, N.J.S.A. 2A:15-3, for Lazarich's pain and suffering from the second surgery until his death. The jury also awarded $35,000 wrongful death damages to Lazarich's estate for the pecuniary loss to his son and daughter. N.J.S.A. 2A:31-1 to -6. Because the jury found under Scafidi that Dr. Galler's negligence reduced by fortypercent Lazarich's chances of survival, the judge reduced by sixty-percent all of plaintiff's damages relating to the second surgery. It is this reduction, ostensibly because of Scafidi, that plaintiff claims was error.

II.
Lazarich's cancerous tumor, while not very large, had grown through the wall of *28 his large intestine and had invaded two lymph glands in that area. The tumor had to be surgically removed, and Lazarich was a candidate for chemotherapy after the surgery. According to Dr. Befeler, had Lazarich received proper treatment, Lazarich would have had a "sixty to seventy-five percent chance of surviving five years" and a "better than even chance of living ten years."
One would assume, based on this testimony, that Lazarich's tumor would qualify as a preexisting condition under Scafidi. "[W]hen defendant's negligence combines with a preexistent condition to cause an injury, the standard charge on proximate cause could confuse or mislead a jury." Id. at 102, 574 A.2d 398. Consequently, in such cases, plaintiffs need only prove that defendants' negligence increased the risk of harm and that the increased risk was a substantial factor in producing the ultimate injury. Id. at 104, 574 A.2d 398.
However, the defendants did not argue that Lazarich's tumor was the preexisting condition under Scafidi. No one asserted that the tumor played any role in causing the surgery complications or Lazarich's death. Instead, defendants argued that possible complications associated with the colon surgery constituted a preexisting condition under Scafidi.
Defendants' Scafidi argument is based solely on the cross-examination of plaintiff's expert, Dr. Befeler. Dr. Befeler testified that the left-sided surgery to remove the cancer from Lazarich had less than ten-percent known risk of complications, including pulmonary embolism, infection, scarring, bleeding, leakage from the anastomosis (small bowel reconnected to the large bowel), ileus (a paralyzed bowel) and wound infection. Dr. Befeler explained that some complications might have occurred anyway even if there had only been one left-sided surgery. The performance of the second abdominal surgery three days after the prior abdominal surgery, according to Dr. Befeler, increased the risk of these known complications by "at least 20-40%". Defendants argued that this testimony justified the Scafidi jury instruction and the consequent verdict reduction. We disagree.

III.
A preexisting condition is "one that has become sufficiently associated with a plaintiff prior to the defendant's negligent conduct so that it becomes a factor that affects the value of the plaintiff's interest destroyed by the defendant." Anderson v. Picciotti, 144 N.J. 195, 211, 676 A.2d 127 (1996)(citing Joseph H. King, Jr., Causation, Valuation, and Chance in Personal Injury Torts Involving Preexisting Conditions and Future Consequences, 90 YALE L.J. 1353, 1357 (1981)). In other words, it is where "the patient [seeks] treatment from a physician with the express purpose to obtain treatment which would alter or delay the outcome attributable to the condition." Golinski v. Hackensack Med. Ctr., 298 N.J.Super. 650, 655, 690 A.2d 147 (App.Div.1997).
Thus, in Scafidi situations there is a likelihood of adverse consequences based on the preexisting condition alone, and the physician's negligence hastens or otherwise fails to stem the patient's downward course caused by the preexisting condition. Scafidi thus deals with cases in which a "defendant's negligence combines with a preexistent condition to cause harmas distinguished from cases in which the deviation alone is the cause of the harm." Scafidi, supra, 119 N.J. at 108-09, 574 A.2d 398.
Here, plaintiff died. It cannot logically be said that the surgery risks *29 combined with the surgeon's negligence to cause the ultimate harm. No doctor testified that any preexisting condition, in this case, could have, without the unnecessary first surgery, caused any of plaintiff's injuries or his death. Such testimony is required for Scafidi to be applicable. Tindal v. Smith, 299 N.J.Super. 123, 135, 690 A.2d 674 (App.Div.1997).
In this case, the jury was asked "By what percentage did the negligence of one or more Defendants decrease Mr. Lazarich's chance of survival?" The jury answered, forty-percent, and defendants argue that this reflects plaintiff expert's opinion that the first surgery enhanced the possibility of complications in the second surgery by approximately forty-percent. However, the only evidence relating to Lazarich's chance of survival pertained to his colon cancer. No doctor linked the surgery complications to any chance of death or survival. In fact, no autopsy was performed and it was not known precisely what caused Lazarich's death.
The only negligence claimed in this case related to Dr. Galler's first unnecessary surgery and the post-operative care he rendered. No one argued that the second surgery was performed negligently. Thus, if Dr. Galler's negligence decreased Lazarich's chance of survival by fortypercent, there would have been a sixtypercent chance that possible surgery complications associated with the first surgery alone would have, without the second surgery, caused plaintiff's demise. There was absolutely no testimony supporting such a conclusion. The only testimony indicated that Lazarich faced less than ten-percent chance of complications associated with the first surgery, and the enhanced risk of the second surgery was caused by the unnecessary first surgery.
Both plaintiff and defense experts agreed that colon surgery has specific complications. But the complications in this case were associated with the surgery, and were only possible consequences. They did not preexist in Lazarich. They did not precede the surgeon's work and did not constitute the reason that brought the patient to the doctor. Every preexisting condition that has been thus far recognized as warranting Scafidi's application has had a probable adverse consequence inherent in the condition and has been present in the patient's body. In addition, the condition has constituted at least one of the reasons that brought the patient to the doctor or has manifested itself during the patient's treatment. Eg., Lynch v. Scheininger, 162 N.J. 209, 215, 744 A.2d 113 (2000) (RH isoimmunization); Gardner v. Pawliw, 150 N.J. 359, 367, 696 A.2d 599 (1997) (defective umbilical cord); Fischer v. Canario, 143 N.J. 235, 239, 670 A.2d 516 (1996) (chest tumor); Lanzet v. Greenberg, 126 N.J. 168, 170, 594 A.2d 1309 (1991) (patient had cataract surgery during which a cardiac episode went unnoticed); Olah v. Slobodian, 119 N.J. 119, 122, 574 A.2d 411 (1990) (pancreatic pseudo-cyst); Scafidi, supra, 119 N.J. at 98, 574 A.2d 398 (premature labor); Velazquez ex. rel. v. Jiminez, 336 N.J.Super. 10, 23, 763 A.2d 753 (App.Div.2000) (abnormally large fetus); Hutchinson v. Atlantic City Medical Center-Mainland, 314 N.J.Super. 468, 472, 715 A.2d 348 (App.Div.1998) (E-coli infection); Arenas v. Gari, 309 N.J.Super. 1, 11, 706 A.2d 736 (App.Div.1998) (obstructive pneumonia); Greene v. Mem'l Hosp. of Burlington County, 299 N.J.Super. 372, 381, 691 A.2d 369 (App.Div.1997)(myocarditis); Ginsberg v. St. Michael's Hosp., 292 N.J.Super. 21, 26, 678 A.2d 271 (App.Div. 1996) (congestive heart failure); Roses v. Feldman, 257 N.J.Super. 214, 215, 608 A.2d 383 (App.Div.1992) (lung cancer); Battenfeld v. Gregory, 247 N.J.Super. 538, 543, 589 A.2d 1059 (App.Div.1991) (ruptured appendix).
*30 In this case, no doctor could have predicted with certainty that Lazarich would definitely suffer one or more of the specific complications that were, after all, only possible. Dr. Befeler explained that there was no way of knowing whether Lazarich would suffer any specific complication from either surgery, though his chances rose significantly in the second surgery because of the first surgery.
Indeed, Dr. Befeler explained how he believed the first surgery and the postoperative care made the second surgery much more difficult and risky for Lazarich and why Dr. Galler's erroneous first surgery proximately caused Lazarich's death. The Dr. explained that Lazarich
"had a history of bad clotting in the veins. Clotting to such a point that he had to have a special filter put in that he wouldn't have passed huge clots into his system but that doesn't protect the patient from little clots which means that when you are in a post-operative status with this patient, you have to do one of several things. Either thin the blood by giving the patient heparin or things like heparin, or put the compression boots which go around the lower leg of the patient, above the ankle to below the knee....
Initially, with the first operation that he did on the 24th, Dr. Galler ordered both, the heparin and the compression stockings. With the second operation that he did three days later, he ordered compression stockings for three days and the heparin was, it was discontinued on the second of February. So that from the second of February on, and the patient who, at that point, was, had a wound infection, who was essentially bed bound, who was about to split his wound openhe had what is called a dehiscence, where the abdomen, actually the wall opens up, and the bowel was actually seen by several nurses in the bottom of the wound.... And during that period of time, he threw, in my opinion, embolisms to the right lung which were defined. And probably they were small embolisms, because the big ones would ordinarily be trapped by the filter, but the little ones get through ...
It was a sufficient problem with the embolism to the lung that they actually could not repair this wound when it fell apart. He had been planned to go to the operating room on the day that he threw the embolism, and the surgery was cancelled and never took place. So from there on, for the remainder of the time that Mr. Lazarich lived, he had an open wound that required dressing changes that was obviously weeping during this entire period of time.
In addition, because of the nature of the surgery and the way it was performed three days after the first operation,... the anastomosis that was done the second time around, and that's a connection between the two pieces of intestine, had to be done two times in the operating room. It was done once, and then it leaked. And the fact that it leaked is a result of having been operated on just three days before that because the bowel doesn't connect well when you've just previously done the same operation. So it leaked. He had to take it out again, and that's a result it was almost twice the time to do the second operation as the first.... And all of that resulted in an increased risk of clotting, which he did; an increased risk of sepsis which is an infection in the body, which he had. He had positive blood cultures in the immediate period before he died. A wound that failed and actually could never be closed.
He was a man who came into the hospital without cardiac problems. He *31 had a minor bundle branch block, which is almost a normal occurrence in a 75 year old patient, but is on no medication when he came to the hospital. And he ended up with cardiac problems, pulmonary problems and infectious problems that brought him down. That's the story."
Finally, the doctor was asked "Doctor, ... do you have an opinion, as to whether the deviations that Dr. Galler did were a proximate cause of the injuries and the resultant death that you've described to us?" The doctor answered: "absent the deviations of Dr. Galler, not only would Mr. Lazarich be alive, but the, we wouldn't be here."
This testimony by Dr. Befeler rendered Scafidi inapplicable because it indicated that Dr. Galler's negligent conduct alone was a proximate cause of the patient's death. Ginsberg v. St. Michael's Hosp., 292 N.J.Super. 21, 30, 678 A.2d 271 (App. Div.1996). Scafidi has not totally eliminated in all cases the well settled principle "that a tortfeasor is liable for the natural and probable consequences of the tortious act." Id. at 35, 678 A.2d 271 (citing Ciluffo v. Middlesex General Hosp., 146 N.J.Super. 476, 482, 370 A.2d 57 (App.Div.1977)).
Because all surgery has complications, if we were to consider normal surgical risks to be preexisting conditions, then any surgical procedure which was negligently performed would be a Scafidi case. For example, assume stomach surgery had a tenpercent risk of infection. If the surgeon then left a sponge in the patient's body, causing an infection, could it be said that the doctor's negligence increased the risk of infection. Is that a Scafidi situation? One would think not because the surgeon's initial negligence was a proximate cause of the actual infection.
In Golinski, supra, 298 N.J.Super. at 652, 690 A.2d 147, we concluded that defendant was not entitled to an increased risk of harm instruction. We found that defendant had not established a preexisting condition, but rather that the plaintiff had the propensity to develop adhesions if surgical procedures were required. Id. at 657, 690 A.2d 147. However, further surgery would not have been required if the defendant had not negligently left a laparotomy pad inside plaintiff's abdomen following a cesarean section. Ibid. Thus, "[i]t was [defendant's] negligence which set other causes in motion and was a substantial factor in bringing about the two subsequent surgical interventions." Ibid.
Here also, based on Dr. Befeler's testimony, plaintiff's death can be traced to a single cause, Dr. Galler's unnecessary first surgery, and the standard proximate cause requirement applies. The record contains evidence supporting the proposition that the first surgery was a cause which necessarily set other causes in motion and was a substantial factor in bringing about plaintiff's death. Ginsberg, supra, 292 N.J.Super. at 29, 678 A.2d 271 (citing Catto v. Schnepp, 121 N.J.Super. 506, 511, 298 A.2d 74 (App.Div.), aff'd o.b., 62 N.J. 20, 297 A.2d 841 (1972)). The jury interrogatory asking whether any negligence decreased Lazarich's survival chances should not have been utilized because Scafidi was not applicable.

IV.
Because Scafidi should not have been charged in this case, we must reverse the judgment awarding wrongful death and survival damages. There is a further complication in that the judge did not instruct the jury on ultimate outcome, which is generally required in a Scafidi case, Fischer v. Canario, supra, 143 N.J. at 254, 670 A.2d 516, and the jury did not specifically determine proximate cause for the patient's death. Without either an ultimate *32 outcome charge or a proximate cause determination, we address whether a new trial on liability and damages is necessary.
The jury was asked by special interrogatory "Did Plaintiff prove that the complications which arose after the second surgery were connected because either (1)there was a first surgery or (2) the first and second surgeries were close in time?" In explaining this question to the jury, the judge told them "Essentially, this is going to ask you to determine whether you accept the opinion of Dr. Befeler, or you accept the opinion of Dr. Flynn. That's the issue." We have already explained how Dr. Befeler believed the two surgeries were related and that Dr. Galler's negligence was a proximate cause of plaintiff's death.
According to Dr. Flynn, defendant's medical expert, the two surgeries were completely unrelated. Dr. Flynn explained that plaintiff's argument relating the first and second surgeries made no sense to him. Dr. Flynn testified that the main problem was the left side surgery "and the fact they did the right side three days earlier, which was a very simple and quick operation, that in my mind had no connection whatsoever." Dr. Flynn believed that the complications in this case that caused Lazarich's death arose solely as a result of the second operation, and thus were not caused by any negligence.
The jury answered the special interrogatory on whether the surgeries were related affirmatively by an eight to zero vote. The jury also ascribed one-hundred percent to Dr. Galler for decreasing plaintiff's chance of survival. The jury must have believed that the complications which arose after the second surgery were connected to the first surgery because of the first surgery or because the first and second surgeries were close in time. Given these responses, we are confident that the jury in essence determined that Dr. Galler's negligence was a proximate cause of plaintiff's death, and a new trial on liability is not necessary.
Defendants never attempted to apportion the damages for Lazarich's death between the negligence and the surgery complications. There was no evidence ascribing what percentage any preexisting condition and negligence contributed to Lazarich's death. Even assuming Scafidi applied, we would conclude that defendants failed to apportion the injuries and consequently are liable for the full damages. Anderson v. Picciotti, 144 N.J. 195, 211, 676 A.2d 127 (1996).
Without the ultimate outcome charge, however, we are uncertain whether the jury provided full damages or reduced the verdict to account for the lost chance percentage they assessed against the doctor. There are indications that the verdict in favor of plaintiff and against Dr. Galler was not reduced, but we cannot know for certain how the jury reached its damage figures.
To resolve this conundrum fairly, and in the hope of eliminating the need for a new trial on damages, we give plaintiff an option. Plaintiff may either accept the verdict on the survival and wrongful death damages unreduced by Scafidi, or elect a new trial on these damages only. The case will be remanded to permit plaintiff to make this choice.
Reversed and remanded for further proceedings consistent with this decision.