**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4448-18T1

JOSEPH KNIGHT and LORRAINE
KNIGHT, husband and wife,

      Plaintiffs-Appellants/
      Cross-Respondents,

v.

VANCE J. WEBER, M.D., SANJIV
PRASAD, M.D., ASSOCIATES IN
CARDIOVASCULAR DISEASE,
PRACTICE ASSOCIATES MEDICAL
GROUP, and ATLANTIC HEALTH
SYSTEM, MORRISTOWN MEDICAL
CENTER,

      Defendants-Respondents/
      Cross-Appellants.

_____

Argued telephonically May 19, 2020 –
Decided June 24, 2020

Before Judges Yannotti, Hoffman and Firko.

On appeal from the Superior Court of New Jersey, Law
Division, Union County, Docket No. L-2692-14.

Paul Manuel Da Costa argued the cause for appellants/cross-respondents (Snyder Sarno D'Aniello Maceri Da Costa, attorneys; Paul Manuel Da Costa, Sherry L. Foley, and Timothy Joseph Foley, of counsel and on the briefs).

Anthony Cocca argued the cause for respondents/cross-appellants (Cocca & Cutinello, LLP, attorneys; Anthony Cocca and Katelyn E. Cutinello, of counsel and on the briefs).

PER CURIAM

In this medical malpractice case, plaintiff Joseph Knight[1] appeals from the order of judgment entered on September 13, 2018 in favor of defendants Vance J. Weber, M.D., Sanjiv Prasad, M.D., Associates in Cardiovascular Disease, LLC (AICD), Practice Associates Medical Group, and Atlantic Health System, Corporation/Morristown Medical Center (AHS/MMC). Plaintiff also appeals a May 21, 2019 order denying his motion for a new trial.

Defendants cross-appeal from the August 29, 2018 in limine ruling granting plaintiff's motion to bar defendants from presenting informed consent evidence relating to the risks of treatment alternatives at trial. After reviewing the record in light of the applicable law, we vacate the September 13, 2018 order of judgment, remand for a new trial on all issues of liability and damages, and

---

[1] Lorraine Knight's claim was dismissed prior to trial.

reverse the May 21, 2019 order denying plaintiff's motion for a new trial. We affirm the August 29, 2018 in limine ruling on the informed consent issue.

I.

We discern the following facts from the evidence adduced at trial and the motion record. In March 2004, plaintiff began treating with Dr. Prasad at AICD for hypertension, high cholesterol, and family history of premature coronary artery disease. He was also a smoker. On November 12, 2012, plaintiff developed chest discomfort while visiting his daughter in Florida. After being evaluated at an emergency room, he was diagnosed with a "small heart attack." A stress test revealed scarring in the bottom wall of his heart, a condition known as mild ischemia. Following complaints of further chest discomfort, plaintiff was transferred to another hospital to undergo a cardiac catheterization to determine whether he needed placement of a stent.

On November 14, 2012, plaintiff underwent a cardiac catheterization with balloon angioplasty. The procedure revealed the left side of plaintiff's heart was functioning normally, but his right coronary artery had a complex and significant blockage. The Florida doctors attempted but failed to place a stent after experiencing great difficulty because of the condition of plaintiff's artery. Instead, they performed a successful balloon angioplasty, which provided a

controlled dissection in the area of the blood vessel lesion. It was undisputed by the experts for all parties at trial that plaintiff sustained damage to his heart as a result of his heart attack.

Plaintiff returned to New Jersey and was evaluated by Dr. Prasad on November 20, 2012. On February 4, 2013, plaintiff underwent elective cardiac catheterization with possible stent placement, as recommended by Dr. Prasad. His partner, Dr. Weber, performed the procedure. During the cardiac catheterization, the record shows that plaintiff's proximal right coronary artery was mechanically dissected by Dr. Weber, and plaintiff suffered another heart attack as a result. He had to undergo emergency coronary artery bypass grafting surgery by Dr. Steve Xydas, a cardiac surgeon. After spending two weeks in the hospital, plaintiff was discharged on February 20, 2013.

Plaintiff asserted professional negligence and lack of informed consent claims against defendants. On August 24, 2018, plaintiff filed a pre-trial information exchange, withdrawing his informed consent claim and seeking in limine to "bar [d]efendants from moving into evidence, or making reference to, informed consent documents and any risks of catheterization being told to [p]laintiff[]." The trial court heard argument on plaintiff's motion and instructed counsel to refrain from presenting any argument or evidence on the issue of

4

informed consent. The matter was tried before a jury between August 29, 2018 and September 13, 2018.

At trial, plaintiff contended that the defendant doctors' recommendations to undergo cardiac catheterization and Dr. Weber's performance of the procedure constituted deviations from the accepted standards of medical care because the procedure was not medically necessary. As a proximate result of defendants' negligence, plaintiff argued a mechanical dissection of the aorta occurred, which led to a heart attack and the need for emergency bypass surgery.

Plaintiff presented evidence that defendants' recommendations to undergo cardiac catheterization and Dr. Weber's performance of the procedure was a deviation from the accepted standards of care because the procedure was not medically necessary. In support of these claims, plaintiff presented testimony from Dr. Brian Swirsky, an expert in the field of interventional cardiology.

Dr. Swirsky testified that but for the catheterization procedure, there would not have been a mechanical dissection of the aorta and hence, no heart attack or emergency surgery. The expert also opined that a blockage similar to the one plaintiff had, if treated only with balloon angioplasty and without stent placement, presented a risk of restenosis, which could lead to congestive heart failure or heart attack, requiring emergency bypass surgery.

5

Plaintiff also proffered testimony from Dr. Xydas, the cardiac surgeon who performed the emergency bypass surgery. Dr. Xydas testified that the mechanical dissection of plaintiff's right coronary artery caused his heart attack and led to the emergency surgery. Dr. Grigory S. Rasin, a psychiatrist, testified as to plaintiff's development of post-traumatic stress disorder (PTSD) as a result of the dissection of the aorta, heart attack, and bypass surgery.

Defendants denied they deviated from any standards of care and maintained plaintiff's injuries were due to his pre-existing condition. They presented testimony from Dr. Daniel P. Conroy, Jr., a cardiology expert, and Dr. Marc Cohen, an interventional cardiology expert. Both experts testified that, as a result of his earlier heart attack in Florida, plaintiff had a blockage requiring treatment, including catheterization, and if that failed, bypass surgery. With continued medical therapy alone, Doctors Conroy and Cohen opined that it was more likely than not plaintiff would develop further narrowing and occlusion of the right coronary artery, which would lead to a heart attack, congestive heart failure, or death.

The defendant doctors testified on their own behalf and both agreed plaintiff suffered an acute dissection of his right coronary artery that was mechanically induced, resulting in his heart attack, emergency surgery, and

additional damage to his heart. However, they concurred with the defense experts that recommending against the procedure would have exposed plaintiff to re-occlusion of his right coronary artery, a probable heart attack, possible heart failure, and death. In accordance with the trial court's ruling barring informed consent evidence, neither defendant was permitted to testify regarding alternative treatments discussed with plaintiff.

At the close of evidence, plaintiff moved for partial judgment pursuant to Ponzo v. Pelle, 166 N.J. 481 (2001), and requested that if the jury determined one or both defendant doctors deviated from the standard of care in recommending and performing the cardiac catheterization procedure, then the jury need not find causation, but should proceed directly to the issue of damages. Plaintiff based the request on the experts' agreement that the mechanical dissection could only have been caused by the catheterization procedure, and could never have happened naturally. The trial court denied the motion.

At the jury charge conference, defendants requested a pre-existing condition charge, pursuant to Scafidi v. Seiler, 119 N.J. 93 (1990), based on plaintiff's history of hypertension, high cholesterol, family history of premature coronary artery disease, smoking, prior heart attack, myocardial infraction, ventricular damage, and right coronary artery blockage in a tortuous vessel.

Plaintiff's counsel responded that no evidence was presented to prove plaintiff's pre-existing cardiac condition could have caused the mechanical dissection. The Scafidi charge was given by the trial court.

Additionally, the trial court granted plaintiff's request for separate jury interrogatories addressing the alleged deviation from the standard of care by each defendant doctor in recommending plaintiff undergo a cardiac catheterization. Plaintiff's request for a separate jury interrogatory on PTSD was denied.

On September 13, 2018, the jury found that both doctors Prasad and Weber deviated from accepted standards of care but determined that their deviations did not increase the risk of harm posed by plaintiff's pre-existing condition. In rendering their verdict, the jury responded:

> THE CLERK: Madam Forelady, will you please rise? Have the members of the jury reached a verdict?
>
> FOREPERSON: Yes, ma'am.
>
> THE CLERK: As to question number one: "Has [plaintiff] proven by the preponderance of the evidence that Dr. Sanjiv Prasad deviated from accepted standard[s] of medical practice by recommending that [plaintiff] undergo a cardiac catheterization?"
>
> FOREPERSON: We have voted yes.
>
> THE CLERK: And what was your vote?

FOREPERSON: 8-0.

THE CLERK: As to question number two: "Has [plaintiff] proven that Dr. Prasad's deviation from accepted standards of medical practice increased the risk of harm posed by [plaintiff's] pre[-]existing condition?"

FOREPERSON: We have voted no.

THE CLERK: May I have your vote, please?

FOREPERSON: 8-0.

THE CLERK: As to question number five: "Has [plaintiff] proven by a preponderance of the evidence that Dr. Vance Weber deviated from accepted standards of medical practice by recommending that [plaintiff] undergo a cardiac catheterization, or by performing the cardiac catheterization?"

FOREPERSON: We have voted yes.

THE CLERK: May I have your vote, please?

FOREPERSON: 8-0.

THE CLERK: As to question number six: "Has [plaintiff] proven that Dr. Weber's deviation from accepted standards of medical practice increased the risk of harm posed by [plaintiff's] pre[-]existing condition?"

FOREPERSON: We voted no.

THE CLERK: And may I have your vote, please?

FOREPERSON: 8-0.

9

THE CLERK: You can be seated.

THE COURT: So that's your verdict, correct? Counsel?

. . . .

Do you want to poll the jury?

[PLAINTIFF'S COUNSEL]: No, Judge.

THE COURT: Okay. All right, ladies and gentlemen. . . . So once again, you're now discharged. Thank you all very much.

The judge accepted the verdict and entered judgment in favor of defendants. Neither the foreperson nor any member of the jury expressed any confusion or error in the court's interpretation of the verdict.

On October 2, 2018, plaintiff moved for a new trial pursuant to Rule 4:49-1. He argued the court erred by giving the pre-existing condition charge and including same on the verdict sheet. Plaintiff also argued that the court should have instructed the jury to proceed directly to the issue of damages once they determined defendants deviated from the accepted standard of care and forego a causation analysis. Defendants opposed the motion contending the pre-existing condition charge was appropriate.

Oral argument was scheduled for November 20, 2018. While the motion was pending, the court requested the clerk's file, which contained the official

verdict sheet completed by the jury.  The official verdict sheet revealed that in addition to the jury's answers to interrogatories one, two, five, and six, the jurors continued to answer interrogatories nine, ten, and eleven, which considered liability, apportionment, and damages.  On January 30, 2019, the court wrote to counsel about the discovery and provided copies.

In apportioning liability, the jury allotted sixty percent to Dr. Weber's deviation from care, forty percent to Dr. Prasad, and zero percent to plaintiff's pre-existing condition.  When presented with the issue of determining the amount of money that would "fairly and reasonably compensate [p]laintiff . . . for his current, past, and future physical and mental pain and suffering," the jurors awarded $603,796.  In the interrogatory addressing what amount of money "would fairly and reasonably compensate [p]laintiff . . . for his past medical expenses[,]" the jurors awarded $98,856, which was the "full amount requested from plaintiff."

On February 4, 2019, the trial court conducted a conference in light of the recently discovered information.  The court stated in reviewing plaintiff's motion for a new trial, he listened to the jury's verdict "several times to make sure [he] didn't miss something in there, because it was an 8-0 verdict."  On that date and in supplemental briefing, plaintiff argued that the court should exercise

its discretion and utilize Rule 1:31-1 to correct a mistake that would result in a miscarriage of justice, or reopen and correct the judgment pursuant to Rule 4:50-1. In opposition, defendants argued that the jury intended to return a "no cause of action," as announced in open court notwithstanding the verdict sheet.

After reviewing the entire verdict sheet and hearing arguments of counsel, the court determined:

> There is no suggestion that the interrogatories presented to the jury in this case were misleading, confusing or ambiguous. Nor was there any inconsistency in the verdict rendered on September 13, 2018. The jury answered questions [one], [two], [five] and [six] unanimously, finding that [d]efendants, Dr. Prasad and Dr. Weber, each deviated from accepted standards of medical practice, but that those deviations did not increase the risk of harm posed by [plaintiff's] pre-existing condition.
>
> The foreperson and other members of the jury did not hesitate, request that any of the remaining interrogatories be read, or in any way otherwise indicate that the verdict as it was read in court, before the [p]laintiff[], [d]efendants and their lawyers was incomplete or incorrect. There is no dispute that the jury intended to, and in fact did, deliver a verdict of "no cause of action." Judgment favored . . . [d]efendants. The jury accordingly was discharged upon announcing its decision.
>
> In the court's opinion, [the] recently obtained completed jury [v]erdict [s]heet creates no ambiguity or inconsistency, and cannot demonstrate that the jury was confused or mis[led].

[Footnote omitted.]

On May 21, 2019, the trial court entered a memorializing order denying plaintiff's motion for a new trial or, in the alternative, an amended judgment.

On appeal, plaintiff argues that the trial court erred by: (1) denying the motion for a new trial based on the completed verdict sheet; (2) using a verdict sheet based on plaintiff's "irrelevant" pre-existing condition rather than case-specific interrogatories; (3) giving the jury a Scafidi charge; and (4) ruling he would give the jury separate interrogatories for PTSD damages and then reversing that ruling after counsel made their closing arguments.

In their cross-appeal, defendants argue that if a new trial is ordered, they must be allowed to present evidence of the risks of treatment alternatives, which the trial court excluded on the eve of trial when plaintiff withdrew his informed consent claim.

II.

We recognize the fundamental principle that jury trials are a bedrock part of our system of civil justice and the fact-finding of a jury deserves a high degree of respect and judicial deference. See e.g., Caldwell v. Haynes, 136 N.J. 422, 432 (1994). In terms of its assessment of the relative strength of the proofs, a jury verdict is "impregnable unless so distorted and wrong, in the objective and

A-4448-18T1

articulated view of a judge, as to manifest with utmost certainty a plain miscarriage of justice." Doe v. Arts, 360 N.J. Super. 492, 502-03 (App. Div. 2003) (quoting Carrino v. Novotny, 78 N.J. 355, 360 (1979)).

Rule 4:49-1(a) provides that a trial judge shall grant a new trial if, "having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a miscarriage of justice under the law." Jury verdicts are thus "entitled to considerable deference and 'should not be overthrown except upon the basis of a carefully reasoned and factually supported (and articulated) determination, after canvassing the record and weighing the evidence, that the continued viability of the judgment would constitute a manifest denial of justice.'" Risko v. Thompson Muller Auto. Grp., Inc., 206 N.J. 506, 521 (2011) (quoting Baxter v. Fairmont Food Co., 74 N.J. 588, 597-98 (1977)); see also Boryszewski v. Burke, 380 N.J. Super. 361, 391 (App. Div. 2005) (indicating that "[j]ury verdicts should be set aside in favor of new trials only with great reluctance, and only in cases of clear injustice."). In reviewing a trial judge's decision on a motion for a new trial, we view the evidence in a light most favorable to the party opposing the new trial motion. Caldwell, 136 N.J. at 432.

When evaluating a decision of whether to grant or deny a new trial, we must give "due deference" to the trial court's "feel of the case." Risko, 206 N.J. at 522 (citations omitted). Importantly, a judge may not "substitute his judgment for that of the jury merely because he would have reached the opposite conclusion; he is not a thirteenth and decisive juror." Dolson v. Anastasia, 55 N.J. 2, 6 (1969). "That is not to say . . . that [an appellate court] must accept the trial court's legal reasoning[,]" which is reviewed de novo. Hayes v. Delamotte, 231 N.J. 373, 386-87 (2018).

Here, plaintiff argues he is entitled to a new trial, or in the alternative an amended judgment, upon the discovery of the jury's original verdict sheet, which included additional, undisclosed information contrary to what the court and parties believed the verdict was. When read as a whole, plaintiff contends that the verdict sheet shows that the jury unanimously found Doctors Prasad and Weber were both negligent for recommending and performing the cardiac procedure, and were liable for one hundred percent of the resulting damage. In turn, since the jury attributed zero percent of the causal effect to plaintiff's pre-existing condition, the doctors' negligence did not increase the risk of harm resulting from his pre-existing condition.

A-4448-18T1

We conclude that the trial court erred by denying plaintiff's motion for a new trial. The verdict sheet, which came to light when plaintiff made his motion for a new trial, indicated that the jury found defendants' deviations were the proximate cause of plaintiff's ultimate injuries, not his pre-existing condition. Moreover, the jury awarded plaintiff damages.

Because the trial court did not discover the inconsistences with the completed verdict sheet until long after the jury was discharged, thereby precluding the opportunity to clarify the confusion, there was a miscarriage of justice warranting a new trial. See Baxter, 74 N.J. at 597-98. We reject plaintiff's argument that Rule 4:50-1 should be invoked to amend the judgment to conform with the original verdict sheet.[2]

Courts should use Rule 4:50-1 "sparingly, in exceptional situations; the [r]ule is designed to provide relief from judgments in situations in which, were it not applied, a grave injustice would occur." Hous. Auth. of Morristown v. Little, 135 N.J. 274, 389 (1994). Neither the jury foreperson nor the other members of the jury made an effort to correct the court when he asked whether

---

[2] Rule 4:50-1 provides a court may grant a party relief from a judgment or order upon a showing of: "(a) mistake, inadvertence, surprise, or excusable neglect; (b) newly discovered evidence . . . ; (c) fraud . . . ; (d) the judgment or order is void; (e) the judgment or order has been satisfied . . . ; or (f) any other reason justifying relief from the operation of the judgment or order."

A-4448-18T1

what the foreperson declared was their final verdict. Moreover, it was not explicitly communicated that the verdict was in favor of plaintiff or defendants at all. Clearly, the jury was confused and rendered an inconsistent verdict incapable of justifying relief under Rule 4:50-1. We conclude that a new trial on liability and damages is warranted. As a result, we reverse the order denying plaintiff's motion for a new trial or amended judgment.

## III.

Next, plaintiff contends the judge erred by charging the jury pursuant to Scafidi. Under Scafidi, "a careful analysis . . . is required to determine whether the evidence is sufficient to permit a jury to decide, as a matter of reasonable medical probability, that both prongs of a two-part test are satisfied." Anderson v. Picciotti, 144 N.J. 195, 206 (1996).

The first prong requires evidence that the defendant deviated from the applicable standard of care and that such deviation increased the risk of harm to the plaintiff from an established pre-existing condition. Ibid. If that prong is satisfied, the jury must determine whether the deviation, in the context of the pre-existing condition, was "sufficiently significant in relation to the eventual harm to satisfy the requirement of proximate cause." Ibid. (citing Scafidi, 119 N.J. at 109).

The defendant has the "burden of segregating recoverable damages from those solely incident to the pre[-]existing disease." Id. at 212 (quoting Fosgate v. Corona, 66 N.J. 268, 273 (1974)). The defendant must "demonstrate that the damages for which he is responsible are capable of some reasonable apportionment and what those damages are." Id. at 208 (quoting Fosgate, 66 N.J. at 273).

On appeal, plaintiff argues that it was "legally impossible" for the court to give a Scafidi charge because the ultimate harm he suffered was the mechanical dissection of his coronary artery during the cardiac catheterization procedure, which he claims never could have happened naturally and cannot be considered a pre-existing condition. We disagree.

In negligence claims, the burden of proof on all elements is ordinarily on the plaintiff. Myrlak v. Port. Auth., 157 N.J. 84, 95 (1999); Buckelew v. Grossbard, 87 N.J. 512, 525 (1981). Each element must be established by a preponderance of the evidence. Saks v. Ng, 383 N.J. Super. 76, 98 (App. Div. 2006); see also Model Jury Charges (Civil), 1.12H "Preponderance of the Evidence" (approved Nov. 1998). In medical malpractice cases, a plaintiff must prove the applicable standard of care, that a deviation from that standard has

occurred, and that the deviation proximately caused the injury. <u>Verdicchio v. Ricca</u>, 179 N.J. 1, 23 (2004) (citations omitted).

"To recover damages for the negligence of another, a plaintiff must prove that the negligence was a proximate cause of the injury sustained." <u>Scafidi</u>, 119 N.J. at 101. Though "the concept resists definition," courts describe proximate cause as "a standard for limiting liability for the consequences of an act based upon mixed considerations of logic, common sense, justice, policy and precedent." <u>Ibid.</u> (internal quotation marks and citations omitted). It is "a factual issue, to be resolved by the jury after appropriate instruction by the trial court." <u>Ibid.</u>

The standard jury charge on proximate cause differs when the medical negligence is combined with a pre-existing condition. This is because the conflicting concepts may

> confuse or mislead a jury. The language of the standard charge assumes that the defendant's negligence <u>began</u> a chain of events leading to the plaintiff's injury. If a plaintiff has a pre[-]existent injury or disability and is then adversely affected by a defendant's negligence, the standard by which the jury evaluates causation must be expressed in terms consistent with the operative facts.
>
> [<u>Id.</u> at 102.]

Therefore, a different standard must apply. When a plaintiff has a pre-existing condition in a medical malpractice action, "[e]vidence demonstrating within a reasonable degree of medical probability that negligent treatment increased the risk of harm posed by a pre[-]existent condition raises a jury question whether the increased risk was a substantial factor in producing the ultimate result." Id. at 108. Typically, this arises in situations where a plaintiff seeks treatment for a pre-existing condition, and the medical professional, through his or her own negligence, "either fails to diagnose or improperly treats the condition, causing it to worsen and sometimes causing the plaintiff to lose the opportunity to make a recovery." Komlodi v. Picciano, 217 N.J. 387, 415 (2014).

First, the jury must verify, "as a matter of reasonable medical probability, that the deviation [from care] . . . increased the risk of harm from the pre[-]existent condition." Scafidi, 119 N.J. at 109. Then, the jury must use the "substantial factor test" which requires them to determine "whether the deviation [from care], in the context of the pre[-]existent condition, was sufficiently significant in relation to the eventual harm to satisfy the requirement of proximate cause." Ibid. Therefore, a provider of medical services is only liable for an injury if the negligence, as distinguished from the pre-existing condition,

20

was a substantial factor in producing the harm. Importantly, "merely establishing that a defendant's negligent conduct had some effect in producing the harm does not automatically satisfy the burden of proving it was a substantial factor . . . ." Verdicchio, 179 N.J. at 25.

After the plaintiff satisfies the burden of proving the first two elements by a preponderance of the evidence, the burden shifts so that "the defendant-physician, not the 'innocent' patient, is required to establish the percentage of damages attributable to the physician's negligence." Komlodi, 217 N.J. at 412 (citing Verdicchio, 179 N.J. at 37). These three steps are known as a Scafidi charge. Id. at 413-14. When charging Scafidi, a trial court should review the facts relevant to the instruction and identify the pre-existing disease or condition. Id. at 417.

In this case, the trial court was correct that

> it was uncontroverted that [plaintiff] sought treatment for his pre-existing cardiac condition . . . which included a history of high blood pressure, high cholesterol, family history of premature coronary artery disease and smoking, not to mention the prior heart attack, myocardial infarction, ventricular damage and the right coronary artery blockage in a tortuous vessel . . . . During the trial, [p]laintiff[] sought to prove that [Doctors] Prasad and Weber—in recommending a second cardiac catheterization and attempting to stent the right coronary artery—failed to appropriately diagnose and treat [plaintiff's] pre-existing condition.

21

> That, in turn, caused the pre-existing condition to worsen and prevented [plaintiff] from obtaining the recovery he might otherwise have been able to achieve . . . . As a result [of this argument], . . . it was proper and necessary for the jury to be instructed to consider the pre-existing conditions . . . .
>
> [(Footnote omitted).]

We conclude that the trial court did not err by charging the jury under Scafidi and using a verdict sheet asking the jury to assess defendants' alleged negligence in light of plaintiff's pre-existing condition. The evidence showed plaintiff sought treatment from Dr. Prasad immediately after suffering from a heart attack and failed stent procedure in Florida, which revealed significant blockage in the form of calcified plaque in his right coronary artery and resulted in damage to its left ventricle. Plaintiff was examined by Dr. Prasad years before because of his personal and family history. Clearly, plaintiff sought out defendants "with the express purpose to obtain treatment which would alter or delay the outcome attributable to [his heart] condition." Holdsworth v. Galler, 345 N.J. Super. 294, 299-300 (App. Div. 2001).

There was sufficient evidence to show the cardiac catheterization was recommended and conducted in order to treat plaintiff's pre-existing cardiac condition, which previously resulted in a heart attack and unsuccessful remedial procedure. Undeniably, this was a situation where there was "a likelihood of

22

adverse consequences based on the pre[-]existing condition alone, and the physician's negligence hasten[ed] or otherwise fail[ed] to stem the patient's downward course by the pre[-]existing condition." Id. at 300-01. Therefore, the judge did not err by charging the jury under Scafidi.

Plaintiff also challenges the court's inclusion of an interrogatory regarding plaintiff's pre-existing condition and contends the jury should have been instructed to decide damages immediately upon their finding that defendants deviated from the standard of care. Again, we disagree.

Plaintiff relies, in part, on the Court's decision in Ponzo. In that case, the plaintiff was struck from behind by another vehicle when stopped in traffic, and sued the defendant for negligence, citing injuries to her knee, back, and neck. Id. at 483, 485-86. The court submitted a single interrogatory to the jury: "Did the defendant's negligence proximately cause damage to [the plaintiff]?" Id. at 487. The jury answered in the negative and found for the defendant. Ibid. The Court was faced with the issue of "[w]hether there was a concession that [plaintiff] suffered a knee injury in the accident; and if so, whether the single jury interrogatory improperly skewed the outcome of the case." Id. at 488.

The Court held, while the plaintiff's other injuries were "hotly contested" at trial, "there was no contest over the fact that [the plaintiff] sustained an injury

to her knee during the accident." Id. at 490.  Given that context, the Court then turned to the issue of whether the single interrogatory used by the trial court was misleading, confusing, or ambiguous when considering the charge as a whole. Id. at 490.  Because the defendant conceded the plaintiff's knee injury was proximately caused by his negligence, the Court held the jury's only inquiry regarding plaintiff's knee injury should have been damages, while her remaining allegations called for more detailed findings.  Id. at 491.

In so holding, the Court announced that "to avoid unnecessary effort and possible confusion, a trial judge should eliminate from disposition matters that are not truly in contest."  Id. at 492; see also Menza v. Diamond Jim's, Inc., 145 N.J. Super. 40, 45 (App. Div. 1976) (holding that "where the facts adduced leave no doubt that if there was negligence there was also proximate cause, the jury should be instructed only as to the issue of negligence.").  For example, in Ponzo, the trial court "should have crafted interrogatories that reflected the concession regarding the knee injury and detailed the distinct approach that was required of the jury" in that context, as opposed to her other injuries.  Ponzo, 166 N.J. at 492.

Plaintiff compares the circumstances of his case to those of the plaintiff in Ponzo.  He claims that the only way he could have suffered from a mechanical

dissection was defendants' negligence in recommending and performing the procedure. Further, he argues that defendants' experts conceded the dissection could only have occurred as a result of the cardiac catheterization surgery, making a proximate cause analysis irrelevant.

According to plaintiff, the only issue remaining for the jury to decide was whether defendants deviated from the standard of care; therefore, the interrogatories, as written, were misleading and confusing, and resulted in a miscarriage of justice. He asserts that the court should have tailored the verdict sheet to address only the disputed elements of the case.

On this issue, the court stated:

> In this case, to say that [d]efendants vigorously contested their alleged negligence and that any negligence on their part proximately caused any of plaintiff's injuries would be an understatement. Defendants and their experts testified and presented credible evidence—and [p]laintiff's own expert agreed—that [plaintiff's] pre-existing cardiac condition, at the outset, presented a significant risk of heart attack. Based upon that evidence and the attendant arguments, the court concluded that it instruct the jury to evaluate the proximate cause and pre-existing condition issues consistent with Scafidi.

The trial court was correct in its analysis. We note that the facts and circumstances presented in Ponzo differ significantly from the case under review. First, defendants here did not concede negligence or admit that their

25

actions proximately caused plaintiff's injuries. Instead, defendants argued that they recommended and performed the procedure to prevent similar harm to plaintiff in the future—a heart attack and emergency bypass surgery. There was a significant risk those harms would, in fact, occur based on plaintiff's pre-existing conditions.

Second, the analysis in a medical malpractice case differs from ordinary negligence actions, especially where a pre-existing condition is involved. In a medical malpractice case, plaintiff must prove the applicable standard of care, a deviation from the standard of care, and that the deviation proximately caused the injury, by a preponderance of the evidence standard. Verdicchio, 179 N.J. at 23 (citations omitted). When there is an issue of a pre-existing condition in a medical malpractice case, the jury must decide "as a matter of reasonable medical probability, that the deviation [from care] . . . increased the risk of harm from the pre[-]existent condition" and "whether the deviation [from care] . . . was sufficiently significant in relation to the eventual harm to satisfy the requirement of proximate cause." Scafidi, 119 N.J. at 109.

Here, the central issue is whether defendants' alleged deviation from the standard of care increased the risk of harm already posed to plaintiff due to his cardiac condition. The focus is not simply whether the mechanical dissections

would or would not have occurred but whether defendants' alleged deviation from the standard of care "combine[d] with [plaintiff's] pre[-]existent condition to cause harm . . . . " Holdsworth, 345 N.J. Super. at 300. Even if "defendant's negligent conduct had some effect in producing the harm[,] [it] does not automatically satisfy the burden of proving it was a substantial factor . . . ." Verdicchio, 179 N.J. at 25. This analysis was set forth in the interrogatories provided to the jury.[3]

We are convinced that the trial court properly included a specific interrogatory regarding plaintiff's pre-existing condition.

IV.

Next, plaintiff argues the trial court erred by declining to use separate jury interrogatories regarding his PTSD claim after initially ruling that the charges

---

[3] The jury interrogatories first asked jurors to determine whether defendants deviated from the standard of care. If answered in the affirmative, the jury was instructed to proceed to the next question, which asked whether that deviation increased the risk of harm already posed by plaintiff's pre-existing condition. If answered in the affirmative, the jury was instructed to proceed again to the next question, which asked whether the increased risk was a substantial factor in causing plaintiff's ultimate injuries. If answered in the affirmative, the jury was guided to the final question, which asked whether the defendant doctors met their burden of apportioning some fault to plaintiff. The jury never reached the third step of the analysis, after finding the defendants' negligence did not increase the risk of harm posed by plaintiff's pre-existing condition.

A-4448-18T1

and verdict sheet "would cover PTSD separately" using a different causation charge. Again, we disagree.

Plaintiff argued before the trial court, and reiterates on appeal, that any pre-existing medical condition he may have had was devoid of any precursors for developing PTSD. He contends that instructing the jurors to assess his PTSD damages in the same vein as his other damages using the "increased risk" analysis was misleading, confusing, and not based on the evidence. Further, plaintiff's counsel asserts that he made statements during his closing argument, assuring the jurors that PTSD damages would be specifically included on the verdict sheet and were not, leaving them to speculate about the omission.

After considering the issue again, the trial court indicated "it would be prudent to just let the jury consider . . . [PTSD] as part of the damages" and only decided to change its ruling after listening to closing arguments. The court determined nothing in the summations "would be found by anybody to be contradictory."

When reviewing an error in a trial court's jury charge, a reviewing court "must examine the charge as a whole, rather than focus on individual errors in isolation." Washington v. Perez, 219 N.J. 338, 351 (2014) (quoting Viscki v. Fowler Equip. Co., 173 N.J. 1, 18 (2002)). An appellate court should not reverse

a trial court upon a consideration of the entire charge if it does not "confuse or mislead the jury." Sons of Thunder v. Borden, Inc., 148 N.J. 396, 418 (1997). This includes situations "where the jury outcome might have been different had the jury been instructed correctly." Perez, 219 N.J. at 351 (quoting Velazquez v. Portadin, 163 N.J. 677, 688 (2000)).

Because "trial court[s] must tailor [their] instructions on the law to the theories and facts of a complex case for a jury to fully understand the task before it[,]" Komlodi, 217 N.J. at 409, the court's decisions on giving those instructions are entitled to deference unless they confuse or mislead the jury. Based upon our careful review of the record, we conclude that the trial court did not err by declining to use a separate jury interrogatory regarding PTSD. The court properly determined that the jury should consider plaintiff's alleged PTSD along with his other injuries in the interrogatory addressing damages. We see no prejudice to plaintiff, even though the court changed its ruling after counsel gave closing arguments.

V.

Lastly, we consider defendants' cross-appeal. They argue that if a new trial is required, they should be allowed to introduce "informed consent" evidence. The trial court disallowed defendants from presenting informed

consent evidence, based on the Court's decision in <u>Ehrlich</u>.[4]  At trial, over their objection, defendants contend plaintiff's expert, Dr. Swirsky, testified about options available to plaintiff, which prejudiced their defense.

At a new trial, defendants assert they should be allowed to introduce evidence of the risks or treatment alternatives and their discussions with plaintiff regarding those alternatives because: (1) the theme of plaintiff's case was that defendants "needlessly gambled" with plaintiff's health; (2) an exception should be made to <u>Ehrlich</u> because plaintiff's expert discussed alternative treatments at length and defendants' experts could not; and (3) refusing to would allow plaintiff to have abandoned their informed consent claim unfairly on the eve of trial.

In <u>Ehrlich</u>, the plaintiff suffered complications from a colonoscopy and polypectomy procedure performed by defendant, but her medical negligence action resulted in a no cause of action verdict.  451 N.J. Super. at 123.  On appeal, she contended the trial judge erred, in part, by allowing the defendant to present irrelevant and misleading evidence regarding her giving informed consent for the procedures, though she did not assert a claim of informed consent.  <u>Id.</u> at 128.

---

[4]  <u>Ehrlich v. Sorokin</u>, 451 N.J. Super. 119 (App. Div. 2017).

We announced that "[i]nformed consent is generally unrelated to the standard of care for performing medical treatment." Id. at 129 (citing Eagel v. Newman, 325 N.J. Super. 467, 474-75 (App. Div. 1999)). Plaintiffs generally must meet a different standard to establish a prima facie case for lack of informed consent. In reversing the trial court, we held that "admission of the informed consent in [that] matter, where plaintiff asserted only a claim of negligent treatment, constituted reversible error." Id. at 131. We concluded that the evidence had a "capacity to mislead the jury, thereby making it capable of producing an unjust result . . . because [a] jury might reason that the patient's consent to the procedure implies consent to the resultant injury, . . . [losing] sight of the central question pertaining to whether the defendant's actions conformed to the governing standard of care." Id. at 132.

Here, defendants assert they intended to introduce "informed consent" evidence to establish that different options were discussed with plaintiff to rebut the contention that the cardiac catheterization was unwarranted, and not to suggest plaintiff assumed the risk of the procedure. Specifically, defendants were prohibited from testifying about treatment alternatives such as medical management, angiography, angioplasty, or coronary artery bypass grafting surgery. We are not persuaded by defendants' argument.

31

The trial court properly determined that because plaintiff withdrew his informed consent claim, there was no need to admit evidence of defendants' conversations with plaintiff regarding the risks and benefits of other options because it was irrelevant. We discern no abuse of discretion. Moreover, the court permitted testimony about defendants' thought processes and considerations in reaching their recommendation. As we stated in Ehrlich, "[i]nformed consent is generally unrelated to the standard of care for performing medical treatment." Id. at 129. And, such evidence had the capacity to mislead the jury. Therefore, there is no merit to defendants' cross-appeal.

Reversed and remanded for a new trial consistent with our opinion as to plaintiff's appeal and affirmed as to defendants' cross-appeal. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4448-18T1