292 N.J. Super. 21 (1996)
678 A.2d 271
RUTH GINSBERG, AS EXECUTRIX OF THE ESTATE OF BENJAMIN GINSBERG, AND RUTH GINSBERG, INDIVIDUALLY, PLAINTIFF-APPELLANT,
v.
ST. MICHAEL'S HOSPITAL, DR. HENRY GREEN, DR. TERRENCE TRUITT, DR. JOHN DOE, NURSE JANE DOE, ABC CORPORATION, INTERNATIONAL NURSES AND NURSES AID REGISTRY OF NEW JERSEY, INC. T/A INTERNATIONAL NURSING AGENCY, DEFENDANTS, AND NURSE MARY LEE, RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Submitted March 26, 1996.
Decided June 21, 1996.
*24 Before Judges KEEFE, WEFING and A.A. RODRIGUEZ.
Bross, Strickland, Cary, Grossman & Icaza, attorneys for appellant (Robert R. Cary, on the brief).
Amdur, Boyle, Maggs & McDermott, attorneys for respondent Mary Lee R.N. (John P. Boyle, on the brief).
The opinion of the court was delivered by KEEFE, J.A.D.
Plaintiff Ruth Ginsberg, as Administratrix of the estate of Benjamin Ginsberg and individually, appeals from a jury verdict in this medical malpractice case in which the jury returned a verdict of no cause as to both defendants, Dr. Terrence Truitt, and Nurse Mary Lee.[1]
The following issues are raised on appeal:
POINT I THE TRIAL COURT ERRED IN ITS APPLICATION OF THE INCREASED RISK DOCTRINE OF SCAFIDI V. SEILER, 119 N.J. 93, 574 A.2d 398 (1990).

*25 POINT II THE JURY'S VERDICT ON PROXIMATE CAUSE IS INCONSISTENT, AGAINST THE WEIGHT OF THE EVIDENCE AND A MISCARRIAGE OF JUSTICE AND MUST BE SET ASIDE.
POINT III THE TRIAL COURT ERRED IN EXCLUDING THE TESTIMONY OF THE DECEDENTS TREATING PHYSICIAN AS TO HOW THE OVERDOSE RESULTED IN DEATH.
POINT IV THE TRIAL COURT ERRED IN PERMITTING THE DEFENDANTS TO ARGUE THAT THE FAMILY'S DECISION NOT TO EMPLOY EXTRAORDINARY MEASURES WAS THE CAUSE OF DEATH.
Our review of the record satisfies us that trial error occurred, having the capacity to cause an unjust result. R. 2:10-2. Accordingly, for the reasons stated herein, we remand the matter for a new trial.
On May 30, 1990, Benjamin Ginsberg (Ginsberg), who was ninety years old at the time, experienced weakness and shortness of breath and consulted his personal physician of twenty years, Dr. Henry Green. Dr. Green's diagnosis was congestive heart failure; fluid in the chest cavity that was compressing a lung; kidney failure; arterial sclerosis; and mild diabetes mellitus. Dr. Green arranged for Ginsberg's immediate admission to St. Michael's hospital.
While at St. Michael's it was also found that Ginsberg was hypertensive; had arterial sclerotic heart disease; bronchial pneumonia; Parkinsonism; osteoarthritis with radiculopathy; hypergammaglobulinemia[2]; anorexia; dyspnea; and swelling of the abdomen and extremities. However, Ginsberg's primary problem was congestive heart failure as a manifestation of heart disease. He had lost more than forty percent of his heart muscle so that his heart was not pumping effectively, and blood was backing up into his lungs.
In the hospital, Ginsberg received various forms of treatment. As pertains to this case, he was given small doses of insulin (approximately four or five units) for diabetes. After about a month in the hospital, Ginsberg's condition had stabilized. He *26 was able to get out of bed and sit in a chair. Dr. Green testified that on or about July 13, his condition was such that he could be discharged from the hospital. Dr. Green and the Ginsbergs began making plans for home nursing care.
On July 13, 1990, defendant Dr. Terrence Truitt, a resident at St. Michael's, ordered that Ginsberg receive four units of insulin. Defendant Nurse Mary Lee misinterpreted the order and incorrectly gave Ginsberg forty units of insulin on July 14, 1990. The type of insulin ordered by Dr. Truitt was time-released and did not take effect immediately. However, over the course of the day, Ginsberg's blood sugar level dropped steadily, reaching life threatening levels. He slipped into a coma, his blood pressure dropped and he went into substantial heart failure.
Dr. Green testified that he saw Ginsberg on the morning of July 14, and at that time Ginsberg was in insulin shock. Ginsberg was in a comatose state; he had impaired movement of his lungs; his blood pressure was dropping; he was not getting enough oxygen; and he had a rapid heart rate. As a result of his condition, Ginsberg was moved to the intensive care unit for further management. That day Dr. Green met with plaintiff, and Robert Ginsberg (the Ginsbergs' son) and asked them whether they wanted to employ extraordinary measures in the event of cardiac arrest. The Ginsbergs inquired as to the quality of Ginsberg's life in the event such measures were used, and asked Dr. Green's advice.[3] Dr. Green advised against extraordinary measures, and the Ginsbergs accepted that advice. On July 15, 1990, Ginsberg died of cardiac failure.
Plaintiff filed this medical malpractice action as a result of the death of her husband. All named defendants were dismissed from the action except Dr. Truitt and Nurse Lee. The matter proceeded to trial against them. After five days of trial, the jury returned its *27 verdict. In response to special interrogatories, it found that Dr. Truitt did not deviate from accepted standards of care (interrogatory one), but that Nurse Lee had deviated from accepted standards (interrogatory two). In response to interrogatory three, the jury found that Ginsberg's death would not have occurred when it did but for the deviation from accepted standards by Nurse Lee. In response to special interrogatory number four, the jury also found that the deviation increased the risk that Ginsberg would have died on a date earlier than otherwise would have occurred as a result of his pre-existing condition. However, in response to special interrogatory five, and notwithstanding its answer to the "but for" causation question in interrogatory number three, the jury found that the increased risk was not a substantial factor in producing the death of Ginsberg on a date earlier than otherwise would have occurred. Accordingly, a judgment of no cause for action was entered on behalf of both defendants. After plaintiff's motion for a new trial was denied, this appeal was taken.
Dr. Green completed Ginsberg's death certificate and listed the causes of death as cardiac arrest with associated pneumonia and renal failure. He did not list hypoglycemia or insulin overdose as the cause of death. Although Dr. Green testified that the overdose caused a cascade of other events that killed Ginsberg, he was not permitted to explain why the death certificate read as it did or how, in his view, the insulin overdose caused Ginsberg's ultimate demise. That testimony was excluded because, although he had been deposed, Dr. Green had not been listed as an expert witness. Consequently, the trial judge only permitted him to testify as to what he personally observed and what he did to treat Ginsberg.
The videotaped testimony of Dr. Munoz, plaintiff's expert, was played at trial. Dr. Munoz testified that the low blood sugar caused by the insulin overdose deprived the heart and other organs of the fuel they needed to function. He stated:
I believe the cause of death was insulin overdosage administered two days before his death which caused a chain of events that caused cardiac failure and other organ failures that caused his death on the 15th of July.
*28 It was Dr. Munoz' opinion that Ginsberg would have lived for approximately two more years had the insulin overdose not been given.
Dr. Angelo Scotti, the defense expert, testified that while the overdose of insulin increased the risk that Ginsberg would die on July 15, 1990, the overdose was not a substantial factor in his death because:
Mr. Ginsberg didn't have a heart attack, didn't have one of those ventricular arrhythmias, did not have a seizure, and did not really die a brain death, did not die of hypoglycemia with not enough sugar to his brain and didn't go out and crash his car because he was hypoglycemic. So I couldn't come up either from looking at the chart, or looking at the death certificate, for a reason to say hypoglycemia, low blood sugar from the insulin was the cause of his death. He died a cardiac death he died from his heart disease which he came into the hospital with.
Dr. Scotti also testified that, despite the overdose of insulin, Ginsberg never suffered from the condition known as insulin shock, and that the coma did not interfere with Ginsberg's ability to clear fluid from his lungs as Dr. Green had testified.
Further, Dr. Scotti testified that the death certificate signed by Dr. Green confirmed his opinion because there was no mention of hypoglycemia as the cause of death or the contributing cause of death. With respect to the Ginsbergs' decision not to use extraordinary measures in the event of cardiac arrest, Dr. Scotti testified as follows:
He was put into the intensive care unit to watch his blood sugars and to make sure that he didn't have a problem with seizures or a heart attack or a rhythm problem, but at the same time when they decided to put him in, the decision was made to make him a no code, or do not resuscitate. Now what that means is no extraordinary measures are going to take place, I think that decision was a major reason for his death on the 15th, and that is as he got sicker, as his heart disease progressed, whether it was because he had more fluid or because it was a natural progression of the heart disease, or some combination, the decision was made not to treat him aggressively and to basically let him die a natural death instead of keeping him alive by extraordinary means.
Although he believed the insulin overdose was not a substantial factor in causing Ginsberg's death, Dr. Scotti opined that, if the insulin overdose had not occurred, given his age and multiple medical conditions, Ginsberg would only have lived anywhere from two weeks to two months. He based this estimate on the fact that *29 Ginsberg's congestive heart failure put him at risk for a heart attack, progressively worse congestive failure, pneumonia, a blood clot to his lung, pulmonary embolism, or just a gradual deterioration of his heart.

I & II
Defense counsel argued at trial that this case is one involving increased risk of harm, and, therefore, the standards set forth in Scafidi v. Seiler, 119 N.J. 93, 574 A.2d 398 (1990), were applicable. On the other hand, plaintiff argued that this case is distinguishable from Scafidi, in that Ginsberg had no reasonable chance of recovering from the underlying conditions. She argued that the issue in this instance was the acceleration of the end result, not increasing the risk of the end result occurring or losing the chance of recovery. The trial judge determined that the standards set forth in Scafidi were applicable in this case.
To recover damages for the negligence of another, a plaintiff must prove that the negligence was a proximate cause of the injury sustained. Catto v. Schnepp, 121 N.J. Super. 506, 511, 298 A.2d 74 (App.Div.), aff'd o.b., 62 N.J. 20, 297 A.2d 841 (1972). "In the routine case in which the plaintiff's injury can be traced to a single cause, the standard instruction on proximate cause ... describes it as `a cause which necessarily set the other causes in motion and was a substantial factor in bringing the accident about ...,' and further as a `cause which naturally and probably led to and might have been expected to produce the accident complained of.'" Scafidi, supra, 119 N.J. at 101, 574 A.2d 398, (quoting Model Jury Charges (Civil) § 7.11). However, where the plaintiff has a preexistent injury or disability and is then adversely affected by a defendant's negligence, the jury could be confused by a "but for" instruction as to causation. Ibid. In order to avoid that possibility, the Scafidi Court announced the rule that "[i]f a plaintiff has a preexistent injury or disability and is then adversely affected by a defendant's negligence, the standard by which the jury evaluates causation must be expressed in terms consistent *30 with the operative facts." Id. at 102, 574 A.2d 398. The Court explained that this "modified standard of proximate causation is limited to that class of cases in which a defendant's negligence combines with the condition to cause harm  as distinguished from cases in which the deviation alone is the cause of the harm." Id. at 108-109, 574 A.2d 398.
[T]he jury is first asked to verify, as a matter of medical probability, that the deviation is within the class, i.e., that it increased the risk of harm from the preexistent condition. [citations omitted]. Assuming that the jury determines that the deviation increased the risk from the preexistent condition, we use the "substantial factor" test of causation because of the inapplicability of "but for" causation to cases where the harm is produced by concurrent causes. See Prosser and Keeton on Torts, § 41 at 266-268; Malone, Ruminations on Cause-In-Fact, 9 Stan.L.Rev. 60, 88-90 (1956). The "substantial factor" standard requires the jury to determine whether the deviation, in the context of the preexistent condition, is sufficiently significant in relation to the eventual harm to satisfy the requirement of proximate cause.
[Id. at 109, 574 A.2d 398.]
Applying the foregoing principles to this case, we are satisfied that the Scafidi charge was appropriate. While both plaintiff and defendants conceded that Ginsberg's underlying condition would ultimately cause his death, plaintiff contended that the insulin overdose combined with his underlying condition to accelerate his death. Defendants, on the other hand, contended that, while the overdose increased the risk of premature death, Ginsberg actually died from his underlying congestive heart failure, and that the overdose was not sufficiently significant in the overall picture to require defendants to be held legally accountable for Ginsberg's death. The question for the jury to answer, therefore, was whether the overdose of insulin combined with Ginsberg's pre-existing condition to bring about his premature death, or whether it was his pre-existing condition alone that caused it. The scenario fits squarely within the Scafidi construct of increased risk of harm causation. No doctor testified that the overdose alone would have produced death regardless of Ginsberg's condition. Had that been the testimony, Scafidi would not have been applicable.
*31 As we see it, the error in this case was not the decision to charge Scafidi but, rather, requiring the jury to answer interrogatories relevant to both "but for" causation and "substantial factor" causation in the same case; failing to tell the jury the difference between the two concepts; permitting improper evidence on the "substantial factor" aspect of the causation charge; and prohibiting Dr. Green from explaining fully the opinions he formed during the course of treating Ginsberg as to the cause for the conditions that eventuated in his death.
The pertinent part of the charge on causation was as follows:
[P]laintiff claims that the defendant's negligence increased the risk of harm and accelerated Mr. Ginsberg's death.
To establish proximate cause under these circumstances, first plaintiff must prove by the greater weight of the more believable evidence that the defendant's negligence increased the risk of harm posed by Mr. Ginsberg's progressive conditions. Second, plaintiff must prove by the greater weight of the more believable evidence that the increased risk was a substantial factor of accelerating Mr. Ginsberg's death.
If the professional negligence, that is the malpractice charged by plaintiff, was itself too remotely or insignificantly related to the ultimate result, then in a legal sense the claim [sic] negligent act by Dr. Truitt or Nurse Lee would not constitute a substantial factor.
That is, essentially, the Scafidi charge. However, in special interrogatories the jury was asked to answer the following questions pertaining to proximate cause:
3) Would Mr. Ginsberg's death on or around July 15, 1990 have occurred even if there was not a deviation from accepted standards?
4) Did the deviation increase the risk that Mr. Ginsberg would have died on a date earlier than otherwise would have occurred as a result of his pre-existing conditions?
5) Was the increased risk a substantial factor in producing his death on a date earlier than otherwise would have occurred?
The third interrogatory is clearly one that addresses "but for" causation. The jury answered that question "no." That is, Ginsberg would not have died on July 15, but for Nurse Lee's negligence. The fourth and fifth interrogatories are Scafidi, "increased risk" questions. The jury answered interrogatory four "yes," but answered interrogatory five "no." Considering the jury's answer to all three questions, it found that plaintiff met the *32 higher burden of proof but not the lesser one. Thus, the answers are facially inconsistent; undoubtedly the result of mixing the two concepts of causation together without explanation. Had the jury been properly instructed on "but for" causation (the higher standard of proof) we would consider molding the verdict and remanding only for a trial on the issue of damages. However, the trial judge did not instruct the jury on "but for" causation, or otherwise explain that an affirmative answer to interrogatory three meant that they did not have to address questions four and five. Thus, we cannot be sure that the jury understood the issue that it was addressing when it answered interrogatory three.
In conclusion, we are satisfied that the judge's combining the two concepts in the interrogatories confused the jury and was reversible error.

III
Plaintiff maintains that the trial judge committed reversible error when she excluded testimony of Dr. Green as to how the overdose resulted in Ginsberg's death. Dr. Green was only permitted to testify as to what he personally observed and the treatment he rendered for Ginsberg. Because Dr. Green was not named as an expert witness for the plaintiff and had not provided a report to defense counsel, he was not permitted to testify as to his opinions regarding Ginsberg's condition or what he thought was the cause of Ginsberg's death.[4]
It is well settled that treating physicians may testify as to any subject relevant to the evaluation and treatment of their patients. Stigliano v. Connaught Labs., 140 N.J. 305, 658 A.2d 715 (1995). In Stigliano, the Supreme Court affirmed the Appellate Division's reversal of the trial court's ruling excluding testimony by the plaintiff's treating physician as to the cause of her seizure disorder. Id. at 307, 658 A.2d 715. The Court reasoned *33 that "[b]ecause the determination of the cause of a patient's illness is an essential part of diagnosis and treatment, a treating physician may testify about the cause of a patient's disease or injury." Id. at 314, 658 A.2d 715. The principle announced in Stigliano is equally applicable here. Therefore, the exclusion of Dr. Green's testimony regarding the cause of Mr. Ginsberg's death on July 15, 1990, was error.
The exclusion of Dr. Green's proposed testimony was especially unfair and prejudicial in light of the fact that the defense was permitted to use the death certificate that Dr. Green had signed as support for its position. Defense counsel questioned Dr. Green as to the causes of death that he placed on the certificate, but Dr. Green was not permitted to explain how he came to those conclusions. Further, the defense expert alluded to the death certificate as support for his conclusion that the insulin overdose was not a substantial factor in Ginsberg's death.

IV
Plaintiff also asserts that the trial judge committed reversible error when she: (1) allowed defendants to argue that the family's decision not to use extraordinary measures was the cause of death; and (2) refused to instruct the jury not to consider the role that the do not resuscitate (DNR) decision played in Ginsberg's death. In her brief, defendant denies that the defense suggested that the DNR decision was a substantial factor in Ginsberg's death on July 15. After reviewing the trial record, we agree with plaintiff's position that the argument was made; that is was improper; and that it was capable of producing an unjust result.
When Ginsberg became comatose following the overdose, Dr. Green met with the Ginsberg family, and together they decided whether to employ extraordinary measures in the event of cardiac arrest. The Ginsbergs based their decision not to use extraordinary measures upon Dr. Green's advice and the quality of Ginsberg's life in the event such measures were used. When Ginsberg *34 went into cardiac arrest on July 15, 1990, no extraordinary measures were used to save his life.
Despite the assertion to the contrary in defendant's brief, Dr. Scotti testified that the decision not to resuscitate Ginsberg was a substantial factor in his death. Dr. Scotti's testimony as to this issue is as follows:
He was put into the intensive care unit to watch his blood sugars and to make sure that he didn't have a problem with seizures or a heart attack or a rhythm problem, but at the same time when they decided to put him in, the decision was made to make him a no code, or do not resuscitate. Now what that means is no extraordinary measures are going to take place, I think that decision was a major reason for his death on the 15th, and that is as he got sicker, as his heart disease progressed, whether it was because he had more fluid or because it was a natural progression of the heart disease, or some combination, the decision was made not to treat him aggressively and to basically let him die a natural death instead of keeping him alive by extraordinary means. [emphasis added]
Additionally, defense counsel used this point in his summation to infer that the DNR decision was a substantial factor in Ginsberg's death. The pertinent part of the summation is as follows:
So, was the injection a substantial factor? Dr. Scotti says no, nobody disputes that. I don't think Dr. Munoz disputes that. I don't even know if he was asked that question. And we have  without trying to  or without wanting to offend anybody, but in the same time  in the same way wanting to defend my client as I am sworn to do, what about that no code? Was that a cause of Ginsberg's death? Because Dr. Scotti says that code was reversible. Now we don't know the quality of Mr. Ginsberg  what quality of life would have been after that, and no one can say except the Lord whether it would have been reversed, but Dr. Scotti said it was reversible....
And that decision was made by the Ginsberg family with Dr. Green. The conversation probably words to the effect, ... "It appears to me, from the point of view of a doctor, with all the diseases and now we have the overdose that perhaps if he has a heart attack we should not call the code team. We should not try to keep Mr. Ginsberg alive, but that Mrs. Ginsberg and Mr. Ginsberg is your decision." And they decided accordingly. It's how can you make that decision and then blame it on Mary Lee.
The jury's answer to the fifth interrogatory reflects that it may very well have relied upon Dr. Scotti's testimony to conclude that there was a factor which was a more substantial cause of Ginsberg's death on July 15 than the overdose of insulin. Both Dr. Scotti's testimony and defense counsel's argument urged that result.
*35 The DNR decision however, was simply not relevant. The defense's suggestion that the decision was a substantial factor in Ginsberg's death was error. There was no suggestion or evidence in this case that the DNR decision was medically or ethically inappropriate. See, e.g., In the Matter of Quinlan, 70 N.J. 10, 355 A.2d 647, cert. denied, 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289 (1976); In the Matter of Peter, 108 N.J. 365, 529 A.2d 419 (1987); see also In re Dinnerstein, 6 Mass. App. Ct. 466, 380 N.E.2d 134, 139 (1978) (DNR decision found to present a question peculiarly within the competence of the medical profession of what measures are appropriate to ease the imminent passing of an irreversibly, terminally ill patient in light of the patient's history and condition and the wishes of the family). Nor was there any testimony before the jury as to what Ginsberg's life would have been like had extraordinary measures been used to resuscitate him. To argue and imply that the family's decision not to use extraordinary efforts to resuscitate Ginsberg was a substantial factor in his death is not only offensive but contrary to established tort law. It is well settled that a tortfeasor is liable for the natural and probable consequences of the tortious act. Ciluffo v. Middlesex General Hosp., 146 N.J. Super. 476, 482, 370 A.2d 57 (App.Div. 1977). When as here, a medical professional commits an act of negligence having the capacity to accelerate the death of a patient, the medical professional can reasonably foresee that the patient, if competent to do so, or his family with the assistance of health care professionals, may be confronted with decisions affecting the quality of the patient's life. Where there is a decision not to employ extraordinary means in a situation precipitated in whole or in part by the negligence of the medical professional, such a decision may not be used to relieve the negligent medical professional of responsibility based on any theory of causation.
For the foregoing reasons, the judgment under review is reversed and the matter is remanded for a new trial limited to the issues of proximate causation and, if appropriate, damages.
NOTES
[1] Plaintiff does not challenge the liability verdict in favor of Dr. Truitt on appeal. The remaining defendants were dismissed prior to trial and are not affected by this appeal. Thus, the only defendant participating in the appeal is defendant Mary Lee.
[2] Hypergammaglobulinemia is a disturbance of the blood protein so that a certain portion of the body's proteins are elevated.
[3] There was no testimony from any of the physicians describing what Ginsberg's quality of life would have been if extraordinary efforts were used to keep him alive after the insulin overdose.
[4] It should be noted, however, that Dr. Green was deposed prior to trial.