**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1412-19

KATHLEEN D. SEERGY
and MICHAEL J. SEERGY,

      Plaintiffs-Respondents,

v.

FRANK H. RICKER, D.D.S.,
D.M.D., and FRANK H.
RICKER, P.A.,

      Defendants-Appellants.

_____

Argued September 13, 2021 – Decided October 15, 2021

Before Judges Fasciale and Firko.

On appeal from the Superior Court of New Jersey, Law Division, Morris County, Docket No. L-1244-16.

Jennine DiSomma argued the cause for appellants (Saiber, LLC, attorneys; Jennine DiSomma and Sean R. Kelly, of counsel and on the briefs; Brian J. Frederick, on the briefs).[1]

---

[1] Defendants' appellate counsel did not try the case.

Bruce H. Nagel argued the cause for respondents (Nagel Rice, LLP, attorneys; Bruce H. Nagel and Susan Fetten Connors, of counsel and on the brief).

PER CURIAM

Defendants Frank H. Ricker, D.D.S., D.M.D., and Frank H. Ricker, P.A. (collectively defendants) appeal from an October 8, 2019 final judgment entered after a jury trial in this dental malpractice action and a November 22, 2019 order denying their motion for a new trial. Following our review of the record, we reverse both orders in part and remand for a new trial on the issues of liability and proximate cause only.[2]

---

[2] On September 22, 2021, we received a motion filed by plaintiffs seeking leave to submit a letter brief in further opposition to defendants' appeal. At the time of oral argument, plaintiffs' counsel requested permission to submit an additional brief opposing the appeal, which we denied. Nevertheless, the motion was filed. In support of the motion, plaintiffs' counsel certified that additional case law would assist us in adjudicating the issues on appeal. On September 24, 2021, we received defendants' opposition to plaintiffs' motion, both procedurally and on the merits. By way of a separate order, we granted plaintiffs' motion. We conclude that the legal contentions set forth in plaintiffs' motion lack sufficient merit to warrant discussion in this written opinion. R. 2:11-3(e)(1)(E). We add, however, that our Supreme Court's holding in Stigliano v. Connaught Labs., Inc., 140 N.J. 305 (1995) is controlling, and we distinguish the belated arguments raised in plaintiffs' motion herein.

I.

We derive the following facts from the record. Plaintiff[3] Kathleen D. Seergy, age sixty-three, sought treatment to repair her loose dental bridge, which was inserted after tooth #29 (the lower right second bicuspid) was extracted. Her general dentist, Dr. Donald Callahan, referred her to an oral surgeon, Dr. Steven J. Silverman, who recommended extraction of two teeth to be replaced with dental implants. Plaintiff sought a second opinion from Dr. Ricker, a periodontist. On September 9, 2015, plaintiff was evaluated by Dr. Ricker in order to determine whether tooth #30 (the lower right first molar), which was fitted with a crown, could be replaced with an implant. X-rays showed no active infection. Dr. Ricker ordered a CT scan of plaintiff's lower jaw, which was taken on September 21, 2015.

At her second consultation visit on October 7, 2015, Dr. Ricker reviewed plaintiff's CT scan, which revealed "a large" amount of space at the end of one of the roots of tooth #30 that had been recommended for extraction. Typically, there is a millimeter amount of space underneath the tooth area and plaintiff had 8.5 millimeters between the end of the root and nerve. Dr. Ricker testified it

---

[3] We use the terms plaintiff and plaintiffs interchangeably in this opinion.

A-1412-19

was important to avoid injury to plaintiff's inferior alveolar nerve (IAN), which is a protective covering or "tubing" that protects the nerve structure and blood vessels. Dr. Ricker testified that this type of void is indicative of an infection and prescribed an antibiotic. He noted that the bone surrounding the tooth root had "integrated" or "fused" to the tooth.

Dr. Ricker's treatment plan included extracting tooth #30, placing implants in the lower right mandible where tooth #29 had been previously extracted and where tooth #30 was, and placing a bridge over the implants. On October 14, 2015, plaintiff underwent an extraction of tooth #30, which lasted over four hours. According to Dr. Ricker, he encountered difficulty because bone surrounding the tooth was fused to its roots. The roots had fractured into multiple pieces during the extraction and were removed individually by Dr. Ricker after he sectioned the tooth in half. He took an intraoperative x-ray of plaintiff's jaw "to see how the procedure was going, where the root fragments were, and what the bone looked like around those root fragments."

Dr. Ricker testified "at one point [he] decided that there were still maybe some fragments in there but that the procedure had gone long . . . [he] did [not] want to stress [plaintiff] any further" and "it wasn't absolutely critical to get those fragments out at that point." He resumed drilling, removed more bone

4

from plaintiff's jaw, and placed a bone graft in the socket to "promote[] healing of the bone" and "act[] as scaffolding for new bone cells to be able to move into that empty space."  At the conclusion of the procedure, plaintiff developed facial numbness.

The next day, plaintiff advised Dr. Ricker[4] she had "no bleeding, minimal swelling, minimal pain, and . . . some sense of numbness."  Plaintiff described the numbness extended from "the midline of [her] lip all the way over[]" to where the dental procedure had been performed.  Dr. Ricker assured her that some swelling and numbness may occur but "should dissipate quickly" in "maybe six months."  The numbness persisted and did not dissipate.

About seven-to-ten days later, plaintiff met her husband, Michael J. Seergy, in Paris.  While attempting to chew on a piece of bread, plaintiff heard a cracking sound in her jawbone near the surgical site.  Over the next few days, she experienced "throbbing, shooting pains . . . from [her] jaw."  After returning home, plaintiff called Dr. Ricker's office to schedule an emergency appointment and was referred to a covering oral surgeon, Dr. Jon Bartlett, because defendant was on vacation.

---

[4] Plaintiff claims she called Dr. Ricker, and he contends it was the other way around.  This is not germane to our analysis.

A-1412-19

On November 2, 2015, Dr. Bartlett examined plaintiff, took an x-ray, and a Cone Beam Computed Tomography scan (CBCT), which revealed a fracture line within her jawbone. Dr. Bartlett prescribed antibiotics and referred plaintiff to Dr. Vincent Ziccardi, an oral and maxillofacial surgeon, to address her facial numbness, since he was a specialist in nerve repair.

On November 19, 2015, plaintiff was examined by Dr. Ziccardi complaining of "numbness and pain in the right jaw" from the tooth extraction. That day, Dr. Ziccardi ordered a CT scan and performed neurosensory testing, which confirmed a loss of sensory function and an injury to the IAN. His treatment plan included debridement of the infected bone and a nerve decompression or repair.

On January 8, 2016, Dr. Ziccardi performed nerve regeneration surgery on plaintiff in an attempt to restore her sensation and function. He removed the second molar, which was nonviable and a potential source of infection. His surgical note stated that "[t]he inferior alveolar nerve was visualized in the canal[,] which was unroofed by pre-existing surgical defect. The superior aspect of the nerve was exposed . . . ." Following the procedure, plaintiff had partial sensation to her face restored, but she continues to experience painful reactions

6

to items touching her face, a kiss, or the sensation of an electrical shock. Dr. Ziccardi followed up with plaintiff for nine or ten months.

On June 3, 2016, plaintiff filed a complaint alleging defendants were "negligent, careless, reckless and deviated from accepted standards of dental practice." Her husband sued per quod. Defendants filed an answer to the complaint, and the parties exchanged discovery. During the six-day jury trial, the trial court barred defendants from playing a portion of the videotaped deposition of Dr. Ziccardi because the court determined that proximate cause was not an issue in the case. Plaintiff's counsel contended Dr. Ziccardi refused to speak to him ahead of the deposition and rendered a surprise and "extremely prejudicial" opinion that her nerve injury resulted from an inflammation secondary to osteomyelitis pre-dating defendants' extraction procedure.

Defendants countered by claiming: (1) Dr. Ziccardi's operative report, which was exchanged during the discovery period, refers to osteomyelitis, or bone infection, as part of his preoperative and postoperative diagnoses; and (2) Dr. Ziccardi treated plaintiff after the procedure at issue, therefore, the jury was entitled to consider information he might provide about her condition.

In its decision, the trial court highlighted that it was plaintiffs, not defendants, who chose to conduct the videotaped deposition of Dr. Ziccardi after

the scheduled trial date, and neither party listed him as a witness. Defense

counsel's request to redact portions of Dr. Ziccardi's deposition testimony that

included the presentation of certain photographs prompted the court to state:

> I'm just saying frankly it's so late in the game . . . and both parties want limitation placed on very brief testimony.
>
> If I were going to allow it at all, I'd probably allow the whole thing as opposed to sit[ting] and spend[ing] more time arguing about a [thirty]-minute deposition over the limitations. You don't want the photographs. He doesn't want the opinion. And when all is said and done, my reaction is just not to allow it at all.
>
> . . . .
>
> You know, when you're surprised at the time of trial, it's a problem because your expert is not going to be in a position to meet it. And that's what happened. Now, who's to say when the osteomyelitis developed? But for the first time Dr. Ziccardi brings it into the time that the surgical procedure by Dr. Ricker was done.
>
> . . . .
>
> He brings it in at that point, not subsequent to that point but at that point. And it combines with, you know, a surgical defect to create the problem that we have here.
>
> . . . .
>
> And you're trying to put new material in at the tail end of the case that you had no interest in along the way and had no interest in in terms of calling Dr. Ziccardi as a witness at trial. I don't know whether you tried to talk

8

to him or not, but apparently[,] he's not receptive to having conversations with counsel with respect to anybody that he's treated, and that's unfortunately something that happens.

In my view, treating physicians should make themselves available to testify. We try to meet them half-way if we can on schedule, because none of them want to come in. But to say you won't come in, which does happen, there are others that do the same thing and then not even talk to counsel leaves you in a position where surprise is going to occur if it's done at the last minute.

This was totally a last-minute examination that we've spent more time arguing about than was taken in terms of the deposition itself, which was probably under [thirty] minutes and only led to a question or two by [defense counsel] about a second molar that was removed.

So, I mean, you had no interest in this guy until then, and when you got a favorable opinion, you now want to bring it out. I'm saying we're not going to play it at all.

The court granted plaintiffs' motion to preclude the use of Dr. Ziccardi's videotaped deposition in its entirety at trial.

Plaintiff's expert, Dr. Avrum Goldstein, testified as an expert periodontist. He detailed the anatomical periodontal structures while referencing a visual aid and explained the relationship between the IAN and the canal protecting the nerve. Dr. Goldstein opined plaintiff had an anatomical anomaly—at least eight millimeters of bone between the ends of the roots of her teeth and the canal that

protect the IAN—as compared to the two millimeters of space most individuals have.

Dr. Goldstein also showed the jury the x-rays taken by Dr. Callahan and the x-ray taken by Dr. Ricker during the extraction. Based upon the x-rays and materials he reviewed, Dr. Goldstein testified that the dark area at the end of the root, a "radiolucency," was not necessarily indicative of an infection because plaintiff did not complain of any symptoms of an infection. He then compared the CT scans taken by Dr. Ricker and Dr. Bartlett and stated there was "an enormous amount of bone missing" and "significant destruction of [the] bone" in two areas. Ultimately, Dr. Goldstein concluded Dr. Ricker perforated plaintiff's nerve during the extraction, which caused her permanent neurosensory injury.

Defendants planned to call Dr. Steven Scrivo, a periodontist, to testify as their expert witness. On the third day of trial, plaintiff's counsel moved to limit Dr. Scrivo's testimony to the issue of liability only because his two written reports arguably did not address the issue of causation. Consequently, the trial court held a Rule 104 hearing regarding the parameters of Dr. Scrivo's two reports. The court ruled that Dr. Scrivo's reports did not set forth an opinion on proximate cause; rather, his opinions only addressed standard of care and

 A-1412-19

informed consent. As a result, the trial court instructed defense counsel to limit his questioning of Dr. Scrivo to the issue of standard of care. Specifically, the court stated:

> To the extent that you need to explain whatever it is about standard of care and that it was proper is fine, because the opinion is there. And then you can develop the facts even if it's more extensive than what he said in his report, which is really relatively brief considering.

Dr. Scrivo testified before the jury. When asked what the standard of care was for a periodontist treating a patient like plaintiff, Dr. Scrivo responded, "[t]he standard of care is what a trained professional would do in a similar situation." He also testified, consistent with one of his reports, that Dr. Ricker did not deviate from the standard of care in the execution of the extraction procedure.

On September 26, 2019, the jury returned a verdict finding that defendants deviated from the standard of care and proximately caused $1,100,000 in damages to plaintiff and awarded $233,000 to her husband for his per quod claim. On October 8, 2019, the court entered an order of final judgment against defendants for compensatory damages, taxed costs, and pre-judgment interest in the amount of $1,451,499.69.

11

Thereafter, defendants moved for a new trial, arguing: (1) the trial court erroneously excluded the videotaped deposition of Dr. Ziccardi; (2) plaintiffs' counsel made improper comments during summation by invoking "the golden rule"; and (3) the verdict was against the weight of the evidence. The trial court heard oral argument on defendants' motion for a new trial on November 22, 2019, and rendered an oral opinion on the same date denying the motion. A memorializing order was entered that day. This appeal followed.

On appeal, defendant raises the following arguments for our consideration:

> I. THE TRIAL COURT ERRED IN BARRING DR. RICKER FROM USING THE VIDEOTAPED DEPOSITION TESTIMONY OF PLAINTIFF'S SUBSEQUENT TREATING PHYSICIAN, DR. ZICCARDI.
>
> II. THE TRIAL COURT ERRED IN BARRING DEFENDANTS' EXPERT, DR. SCRIVO, FROM TESTIFYING AS TO CAUSATION, AND ALLOWING HIM TO TESTIFY ONLY AS TO THE STANDARD OF CARE.
>
>> A. Dr. Scrivo's Proffered Expert Testimony Was Admissible Because It Was Not Designed To Mislead, It Was No Surprise To Plaintiffs, And Plaintiffs Would Not Have Been Prejudiced By Its Admission Into Evidence.

12

B. The Trial Court's Exclusion Of Dr. Scrivo's Testimony As To Causation Was Unjust And Unreasonable, And Constituted Reversible Error.

III. PLAINTIFF'S COUNSEL'S IMPROPER STATEMENTS IN CLOSING ARGUMENT UNFAIRLY PREJUDICED DEFENDANTS AND REQUIRES REVERSAL AND REMAND.

A. Plaintiff's Counsel Misstated The Standard Of Care For Malpractice In A Professional Sub-Specialty.

B. Plaintiff's Counsel Misstated The Facts And Distorted The Record.

C. Plaintiff's Counsel Improperly Invoked The "Golden Rule" In Explaining The Calculation Of Damages.

D. Plaintiff's Counsel Improperly Attributed Bad Faith To Dr. Ricker For Defending Against Plaintiff's Claims.

## II.

We first address defendant's argument that the trial court erred in barring Dr. Ziccardi's videotaped deposition testimony. Defendants argue that "Dr. Ziccardi is the only non-party medical or dental professional" who examined plaintiff, his testimony is critical because it is not influenced by bias or motive, and he is "arguably the most important potential witness in this case." Plaintiff

13

contends the trial court properly barred Dr. Ziccardi's testimony because it contained surprising and highly prejudicial causation opinions.

"A trial court's evidentiary rulings are 'entitled to deference absent a showing of an abuse of discretion, i.e., there has been a clear error of judgment.'" Belmont Condo. Ass'n v. Geibel, 432 N.J. Super. 52, 95 (App. Div. 2013) (quoting State v. Marrero, 148 N.J. 469, 484 (1997)). "On appellate review, a trial court's evidentiary ruling must be upheld 'unless it can be shown that the trial court palpably abused its discretion, that is, that its finding was so wide off the mark that a manifest denial of justice resulted.'" Id. at 95-96 (quoting Green v. N.J. Mfrs. Ins. Co., 160 N.J. 480, 492 (1999)). "However, [w]hen the trial court fails to apply the proper test in analyzing the admissibility of proffered evidence, [appellate] review is de novo." Konop v. Rosen, 425 N.J. Super. 391, 401 (App. Div. 2012) (first alteration in original) (internal quotation marks omitted).

"As fact witnesses, . . . treating doctors may testify about their diagnosis and treatment of [a plaintiff's] disorder, including their determination of that disorder's cause." Stigliano, 140 N.J. at 314. "Because the determination of the cause of a patient's illness is an essential part of diagnosis and treatment, a treating physician may testify about the cause of a patient's disease or injury."

14

Ibid.  Once a patient's injury or disease is "in issue," a treating physician may "testify about the diagnosis and treatment of that injury or disease."  Ibid.

A treating healthcare provider may testify as a fact witness about any subject relevant to the patient's evaluation and treatment if the testimony is within the provider's personal knowledge and the information that forms the basis of the testimony is obtained from the patient in the course of the treatment pursuant to Rule 701.  The offering party must provide notice to the opposing party and comply with discovery requests.  Delvecchio v. Twp. of Bridgewater, 224 N.J. 559, 577-80 (2016) (citing Stigliano, 140 N.J. at 314); Carchidi v. Iavicoli, 412 N.J. Super. 374, 381 (App. Div. 2010); Ginsberg v. St. Michael's Hosp., 292 N.J. Super. 21, 32 (App. Div. 1996) (holding "[i]t is well settled that treating physicians may testify as to any subject relevant to the evaluation and treatment of their patients").  We see "'no reason to distinguish the doctor['s] testimony as to causation and [the doctor's] testimony as to diagnoses and prognoses' because '[a]ll arise out of and are inextricably linked to [the plaintiff]'s treatment.'"  Carchidi, 412 N.J. Super. at 381-82 (third and fourth alterations in original) (quoting Stigliano v. Connaught Labs., Inc., 270 N.J. Super. 373, 379 (App. Div. 1994)).

Stigliano was a medical practice and product liability action wherein the parents of an infant alleged their child developed a seizure disorder after being immunized against diphtheria, pertussis, and tetanus. 140 N.J. at 307-08. The defendants sought to introduce videotaped depositions of the infant's treating physicians, which addressed their opinions on the cause of the seizure disorder. Id. at 309. The Court held a treating physician may testify about "diagnosis and treatment," including the physician's determination of the cause of the patient's malady. Id. at 314. A treating healthcare provider is not inherently an expert witness, ibid., and "testimony about the likely and unlikely causes of [the plaintiff's] [diagnosis and treatment] is factual information, albeit in the form of [an] opinion." Ibid. (citing N.J.R.E. 701). A treating healthcare provider, however, "is limited to issues relevant to the diagnosis and treatment of [his or her] patient" unless retained and designated as an expert witness. Delvecchio, 224 N.J. at 579.

In Graham v. Gielchinsky, where the defendant-physician used the favorable opinion of an expert witness who was originally consulted by the plaintiff, our Supreme Court held "absent exceptional circumstances, courts should not admit the opinion testimony of an expert that an adversary consulted but did not intend to call at trial." Stigliano, 140 N.J. at 312-13 (citing Graham,

16

126 N.J. 361, 373 (1995)). However, the Court in <u>Stigliano</u> distinguished a treating physician from an expert consulted without the intent to call at trial:

> In <u>Graham</u>, we were concerned that trial attorneys might consult fewer experts because of the fear that "countless claims of malpractice would be leveled against attorneys who put unfavorable expert evidence in as part of their clients' case-in-chief." Here, plaintiffs consulted the treating doctors not for the purpose of obtaining expert testimony to support their cause of action, but for treatment. Allowing defendants to introduce the treating doctors' testimony concerning causation will not affect either [a plaintiff's] medical treatment or counsel's search for experts.
>
> . . . .
>
> The treating doctors did not examine [plaintiff] in anticipation of litigation or in preparation for trial, but for the purpose of treatment. Unlike an expert retained to testify at trial, the treating doctors gained no confidential information about plaintiffs' trial strategy.
>
> [<u>Id.</u> at 313-14 (internal citations omitted).]

Similarly, our Court was "unpersuaded by [the] plaintiff's reliance on <u>Piller</u>, 194 N.J. Super. 392 (Law Div. 1984), and <u>Serrano v. Levitsky</u>, 215 N.J. Super. 454 (Law Div. 1986)." <u>Id.</u> at 314. In <u>Piller</u>, where the defendant-physician called the plaintiff's treating physician as an expert witness regarding the defendant-physician's negligence, we "held that the physician-patient relationship precluded a treating physician from testifying that defendant-

doctors had not deviated from accepted medical standards." Ibid. (citing Piller, 194 N.J. Super. at 399). In Serrano, where the treating physician "insisted on stating gratuitously that the defendant-doctor was not negligent in this treatment of the plaintiff," we "found it 'unfair' to admit an unsolicited statement in the treating physician's report to plaintiff's counsel." Ibid. (citing Serrano, 215 N.J. Super. at 460). In Stigliano, however, the Court noted that both:

> Piller and Serrano differ significantly on the facts. In those cases, the defendant-doctors sought to ask the treating physicians not about their treatment of the plaintiffs, but about the defendant's alleged malpractice. Here, in contrast, defendants seek to call the treating doctors to testify about those doctors' treatment of the . . . plaintiff, including their determination of the cause of [the patient's] condition . . . . As distinguished from the doctors in Piller and Serrano, the treating doctors needed to determine the cause of [plaintiff's] problems so they could treat [the plaintiff]. Accordingly, Piller and Serrano do not prevent the treating doctors from offering their opinions on the cause of [a plaintiff's] disorder.
>
> [Id. at 315.]

In Stigliano, the Court specifically distinguished a treating healthcare provider's opinion testimony from Graham, Piller, and Serrano, which exclusively delt with the use of a treating healthcare provider as an expert witness. See Graham, 126 N.J. at 362 (reviewing the "use of the opinion evidence of an expert consulted by an adversary"); Piller, 194 N.J. Super. at 394

(reviewing "whether the defense should be permitted to call a treating physician as a liability expert witness at trial"); and Serrano, 215 N.J. Super. at 458 (reviewing whether plaintiff is bound by the entire report of his treating physician's expert report). Therefore, we disagree with plaintiffs' counsel that Stigliano and its progeny are inapplicable here.

In the matter under review, plaintiff was referred to Dr. Ziccardi "for evaluation and management of a right [IAN] injury, status post[-]surgical removal of tooth #30" and continued to follow up with him on "multiple occasions for nerve monitoring." Dr. Ziccardi evaluated the IAN using a microscope and removed scar tissue as well as inflamed tissue encompassing the nerve. Therefore, Stigliano is controlling because plaintiff was evaluated, treated, and monitored by Dr. Ziccardi relative to a previously identified injury. Therefore, this matter clearly falls within the Stigliano framework because Dr. Ziccardi is a subsequent treating healthcare provider. We are unpersuaded by plaintiff's argument that her expert, Dr. Goldstein, had already testified before the jury prior to Dr. Ziccardi's videotaped deposition since it was plaintiff's counsel who arranged for and scheduled Dr. Ziccardi's videotaped deposition.

Here, the evidence showed that the CT scan taken by Dr. Ziccardi revealed abnormal findings—osteomyelitis—which caused plaintiff's lower right

jawbone to erode.  She also sustained a nerve injury, and Dr. Ziccardi noted "the nerve was exposed" in that area.  When asked by plaintiff's counsel if Dr. Ricker's surgical procedure contributed to plaintiff's injuries, Dr. Ziccardi responded, "I can't say for sure because . . . it's several months later."  He testified that the inflammatory tissue was a result of the infectious process.  According to Dr. Ziccardi, plaintiff had approximately a fifty-percent sensory improvement following his surgery.  This is precisely the scenario contemplated by the holding in Stigliano and its progeny.

Based upon our careful review of the record, we conclude the trial court erred by barring Dr. Ziccardi's videotaped deposition testimony at trial.  Defense counsel sought to introduce a partially redacted version of Dr. Ziccardi's testimony, which was brief—only about thirty minutes total in duration.  Dr. Ziccardi's testimony included his independent assessment of the cause of plaintiff's infectious process, her injuries, and prognosis for the purpose of diagnosing and addressing her dental issues as her subsequent treating oral and maxillofacial surgeon.  Stigliano, 140 N.J. at 314.  Moreover, even without the videotaped deposition taken by plaintiff's counsel, Dr. Ricker's counsel could have subpoenaed Dr. Ziccardi to testify at trial under Stigliano, and his opinions regarding his evaluation, diagnoses, and treatment of plaintiff would have been

20

presented to the jury. Since the deposition was taken after the date set for trial, there was no resulting prejudice to plaintiff because her counsel knew exactly what Dr. Ziccardi would say, and plaintiff's expert had the benefit of his treating records. Therefore, we reverse the trial court's ruling barring Dr. Ziccardi's videotaped deposition. On remand, either party may file a motion or request a Rule 104 hearing to address any issues potentially involving the presentation of Dr. Ziccardi's videotaped deposition to the jury consistent with our opinion.

III.

We next address defendants' argument that the trial court erred in barring defense expert Dr. Scrivo from testifying at trial as to causation and limiting his testimony to the standard of care. Defense counsel contends Dr. Scrivo's two written reports contained his opinions relative to the proximate cause of plaintiff's injury, thereby obviating any prejudice to plaintiff. In response, plaintiff asserts the trial court properly barred Dr. Scrivo's causation opinions because his reports only addressed the issue of deviation from the standard of care and did not render any opinion as to plaintiff's permanent nerve injury. And, plaintiff contends Dr. Scrivo "never offered any opinion as to whether or how the nerve was damaged during the procedure." No discovery deposition was taken of Dr. Scrivo.

Two rules of evidence govern the admissibility of expert testimony. Rule 702 allows a party to enter opinion testimony from experts qualified in their fields into evidence, and Rule 703 articulates the requisite foundation for expert testimony. N.J.R.E. 702, 703. To be admissible, expert opinions must "be grounded in 'facts or data derived from (1) the expert's personal observations, or (2) evidence admitted at the trial, or (3) data relied upon by the expert which is not necessarily admissible in evidence[,] but which is the type of data normally relied upon by experts.'" Townsend v. Pierre, 221 N.J. 36, 53 (2015) (quoting Polzo v. Cnty. of Essex, 196 N.J. 569, 583 (2008)).

A trial court may preclude expert testimony if a party seeks to introduce "expert testimony on a subject not covered in the written reports furnished by an adversary." Congiusti v. Ingersoll-Rand Co., 306 N.J. Super. 126, 131 (App. Div. 1997). However, because the trial court's decision to exclude testimony is akin to a discovery sanction, Velaquez v. Portadin, 321 N.J. Super. 558, 576 (App. Div. 1999), rev'd on other grounds, 163 N.J. 677 (2000), a trial court may not automatically exclude testimony crucial to a case without engaging in a careful review of the following factors: "(1) the absence of a design to mislead, (2) absence of the element of surprise if the evidence is admitted, and (3) absence of prejudice which would result from the admission of the evidence."

Ratner v. General Motors Corp., 241 N.J. Super. 197, 202 (App. Div. 1990) (quoting Westphal v. Guarino, 163 N.J. Super. 139, 146 (App. Div. 1978)).  If "the testimony in question is 'pivotal' to the case of the party offering the testimony," then "a court should seek to avoid exclusion where possible." Wymbs v. Twp. of Wayne, 163 N.J. 523, 544 (2000) (citations omitted).

When the admissibility of evidence such as expert testimony is at issue, the trial court should conduct a hearing in order to have fuller context in which to address admissibility issues.  See Townsend, 221 N.J. at 54 n.5 ("When [a trial court] decides a motion to strike an expert report, [it] may conduct a hearing under [Rule] 104(a).").  Rule 104(a) permits a judge to "hear and determine" matters relating to the qualification of a person to be a witness, or the admissibility of evidence outside the presence of the jury.  N.J.R.E. 104(a). While the decision to conduct a Rule 104 hearing rests within the discretion of the trial court, "the sounder practice is to afford the proponent of the expert's opinion an opportunity to prove its admissibility at a Rule 104 hearing."  Kemp v. State, 174 N.J. 412, 432-33 (2002).

Here, after considering argument on the issue from both parties, the trial court conducted a Rule 104 hearing in order to clarify what, if any, portion of Dr. Scrivo's reports set forth his opinions on proximate cause.  The trial court

undertook the bulk of the questioning during the Rule 104 hearing.  During the

court's questioning, Dr. Scrivo acknowledged that his opinion on causation

could be construed as ambiguous:

> It was in my report.  That the . . . infection . . . that was
> the whole reason why they take a tooth out, is because
> it's infected.  I said in the first paragraph it was infected
> tooth [#30], and then at the end I said there's pathology
> on the roots which extended beyond the roots.
>
> And . . . to me, it's just so obvious when I said there's
> pathology on the roots, that's where it is.  And it's on
> the x-ray.  And it's on the CAT scan.  And it's [even in]
> Dr. Ricker's notes.  He said there's significant . . .
> periapical pathology.  That's why he gave [plaintiff]
> amoxicillin ahead of time.  That was in his notes.  So,
> to me, I'm just reading—as a dentist, I'm just reading
> something that's just so obvious to me.  Maybe I didn't
> spell it out, but that's what . . . But I think everything's
> there.
>
> [(emphasis added).]

Counsel then had the opportunity to question Dr. Scrivo.  At the

conclusion of the Rule 104 hearing, the trial court determined:

> Now, there is no opinion here on proximate cause.
> There's none.  Absolutely none that I [can] see.  The
> opinions relate to standard of care and informed
> consent.  Informed consent is out of the case[,] which
> leaves only standard of care.
>
> And . . . [Dr. Scrivo] can talk about that to the degree
> that he wants to, and I'm not saying he has to use the

24

exact words in the report. That opinion is there and the plaintiff could prepare for it.

You can't prepare for a causation opinion after reading this report because it's absolutely, totally unclear.

Now, if [plaintiffs' counsel] had chosen to take his deposition, maybe all of this might have been elaborated on, but he doesn't have to take the deposition. He doesn't have to do the work for the expert or for defense counsel. And nothing was ever updated to indicate anything about an opinion on standard of care.

And I've tried to be as clear as I can be even though I'm not a dental expert. But with respect to this bone loss, it was either there before the procedure done by Dr. Ricker, occurred during the procedure, or within two weeks after the procedure up to and including I guess the time that Dr. Bartlett did whatever he did, but not after that.

And if you're saying it didn't occur during the procedure, fine. That's your position. Then it was either before or after. But if it's before, there is no indication that Dr. Ricker treated the patient based on what . . . was shown to him before that was serious bone loss that I know of.

                . . . .

I'm always reluctant to bar an expert from saying something. But I see no basis for the opinion that he apparently wants to give with respect to causation.

Consequently, the trial court ruled that Dr. Scrivo's testimony would be limited

to his opinions on Dr. Ricker's compliance with the standard of care.

A-1412-19

We disagree with the trial court's conclusion that Dr. Scrivo did not opine as to proximate cause. The content of Dr. Scrivo's first report, served on May 15, 2018, references plaintiff's dental records, which refer to the infection of tooth #30 prior to the extraction procedure. And Dr. Scrivo stated in his first report: "If there is pathology on the roots, as was the case, there is no bone past the apex and there is little bone above the canal." Therefore, we are convinced that plaintiff had a reasonable expectation Dr. Scrivo would testify at trial she had a preexisting infection in her jaw unrelated to Dr. Ricker's surgery, which arguably was a proximate cause of her resulting injuries.

Moreover, the record shows Dr. Scrivo disagreed with plaintiff's expert, Dr. Goldstein, who opined that Dr. Ricker damaged the nerve while drilling. Dr. Scrivo explained Dr. Ziccardi's records made no mention of nerve severance, and based upon that observation, Dr. Scrivo opined an infectious process most likely caused the nerve canal damage. In addition, Dr. Scrivo pointed out that Dr. Callahan's records stated tooth #30 was infected. In his supplemental expert report, Dr. Scrivo again addressed the issue of proximate cause.

In light of these evidentiary errors, we are compelled to reverse the trial court's determination barring Dr. Scrivo from testifying as to the issue of proximate cause. Defendants have shown that the trial court's decision

regarding the admission of the proffered evidence was "made without a rational explanation, inexplicably departed from established policies, [and] rested on an impermissible basis." Milne v. Goldenberg, 428 N.J. Super. 184, 197 (App. Div. 2012) (quoting Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002)). Compounding the error, the trial court should have allowed Dr. Scrivo to rely upon Dr. Ziccardi's records as the subsequent treating surgeon. Therefore, on remand, Dr. Scrivo shall be permitted to testify on the issue of proximate cause consistent with the four corners of his two reports and his Rule 104 testimony.

IV.

Lastly, defendants argue that the trial court permitted plaintiffs' counsel to make several improper statements during summation, warranting a new trial. Specifically, defendants claim plaintiffs' counsel: (1) misstated the standard of care for malpractice in a professional sub-specialty; (2) distorted the record by stating defendants claimed Dr. Ricker complied with the standard of care; prescribed antibiotics prophylactically; and knew he did something wrong due to plaintiff's bleeding during the procedure; (3) wrongly invoked the "golden rule"; and (4) improperly attributed bad faith to Dr. Ricker for defending against plaintiffs' claims.

Generally, "[c]ounsel is to be given 'broad latitude' in summation." Diakamopoulos v. Monmouth Med. Ctr., 312 N.J. Super. 20, 32 (App. Div. 1998) (citation omitted). Counsel may urge the jury to "draw conclusions even if the inferences that the jury is asked to make are improbable, perhaps illogical, erroneous or even absurd, unless they are couched in language transcending the bounds of legitimate argument, or there are no grounds for them in evidence." Spedick v. Murphy, 266 N.J. Super. 573, 590-91 (App. Div. 1993) (citations omitted). Counsel's latitude, however, is not without limit because "[s]ummation commentary . . . must be based in truth, and counsel may not 'misstate the evidence nor distort the factual picture.'" Bender v. Adelson, 187 N.J. 411, 431 (2006) (quoting Colucci v. Oppenheim, 326 N.J. Super. 166, 177 (App. Div. 1999)). Furthermore, counsel's comments "must be restrained within the facts shown or reasonably suggested by the evidence adduced." Diakamopoulos, 312 N.J. Super. at 32 (quoting Condella v. Cumberland Farms, Inc., 298 N.J. Super. 531, 534 (1996)).

Defendants contend plaintiffs' counsel distorted the standard of care, highlighting the following portion of plaintiffs' summation:

> Today, you will decide what good and acceptable medicine is. Good, and acceptable dentistry is, for our community. The standard of care, as defined by the experts, is good and acceptable dentistry, which is

applicable in our community. So you will decide whether the treatment that Dr. Ricker rendered in the extraction of the tooth, you will decide whether that is good and acceptable, and whether you want that for your friends, your neighbors, your family.

You will decide whether he committed malpractice. You will decide whether or not a dental procedure to remove a single tooth, and then put a post in the bone, and do an implant, which resulted in permanent nerve injury, and permanent destruction of [plaintiff]'s jaw, is good and acceptable medicine, and good and acceptable dental care. That's what you're going to decide.

Our Court has stated:

[i]t is generally recognized that in the ordinary medical malpractice case "the standard of practice to which [the defendant-practitioner] failed to adhere must be established by expert testimony," and that a jury generally lacks the "requisite special knowledge, technical training and background to be able to determine the applicable standard of care without the assistance of an expert."

[Rosenberg v. Cahill, 99 N.J. 318, 325 (1985) (second alteration in original) (quoting Sanzari v. Rosenfeld, 34 N.J. 128, 134-35 (1961)).]

The trial court then charged the jury in accord with our Court's precedent and Model Jury Charges (Civil), 5.50A "Duty and Negligence" (approved Mar. 2002), stating:

So, given what I've said, it's important for you to know what the standard of care which a specialist i[n] periodontics is required to observe in his treatment of a

29

patient under the circumstances of this case. And based upon common knowledge alone, and without technical training, jurors normally cannot know what conduct constitutes standard dental practice. Therefore, the standard of practice by which a physician's conduct or a dentist's conduct is to be judged must be furnished by expert testimony.

That is to say, by the testimony of persons who again, by reason of their knowledge, training, and experience, are deemed qualified to testify and express opinions on dental subjects.

You as jurors should not speculate or guess about the standards of care by which the defendant dentist should have conducted himself in the diagnosis and treatment of the plaintiff. Rather, you must determine the applicable dental standard from the testimony of the experts that you've heard in this case.

In light of our decision to reverse and remand on the issue of liability for a new trial, we need not address defendants' first two arguments. As to issue three pertaining to the "golden rule" and issue four ostensibly attributing bad faith to Dr. Ricker for defending against plaintiffs' claim, we add the following brief remarks.

Defendants contend plaintiffs' counsel impermissibly invoked the "golden rule" when he stated:

We all know what we love to do. Think if that's taken away from us. . . . Think about it. Think about the things you love to do. And if it's taken away, that's loss

30

of enjoyment of life. That's the idea that you'll think about in the jury room.

It is "improper to construct a summation that appeals to the emotions and sympathy of the jury." State v. Black, 380 N.J. Super. 581, 594 (App. Div. 2005). An attorney may make such an appeal by invoking the "golden rule," a principle that dictates "you should do unto others as you would wish them to do unto you." Geler v. Akawie, 358 N.J. Super. 437, 464 (App. Div. 2003). Courts disallow invocation of the golden rule because such arguments suggest to jurors they should "adopt what they would want as compensation for injury, pain and suffering," and encourage "the jury to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence." Id. at 464-65 (citation omitted).

Here, defendants' argument is unpersuasive because plaintiffs' counsel's comment during summation simply encouraged the jury to rely on their own experience when determining the proper amount of compensation. The thrust of counsel's statement mirrors the charge given to the jury by the trial court, specifically,

> The law doesn't provide you with any table, schedule, or formula by which a person's pain, suffering, disability, impairment, and loss of enjoyment of life may be measured in terms of money. The amount of money is left to your sound discretion. You are to use

your discretion to attempt to make the plaintiff whole, so far as money can do so, based upon reason and sound judgment, without any passion, prejudice, bias, or sympathy.

You each know from your own experience the nature of pain and suffering, disability, impairment, and loss of enjoyment of life. And you each know from your own experience the nature and function of money. And the task of equating the two, so as to arrive at a fair and reasonable award of compensation is a high order of human judgment. For this reason, the law can provide no better yardstick for your guidance than your own impartial judgment and experience.

After reviewing the record, we find nothing objectionable about the summation presented by plaintiffs' counsel. His statements focused on the nature of plaintiff's damages and did not violate the golden rule.

Lastly, for the first time on appeal, defendants allege plaintiffs improvidently attributed bad faith to Dr. Ricker "for defending himself in court rather than admitting negligence." Defense counsel did not object to this statement at the time of summation or during argument on defendants' motion for a new trial. We refrain from addressing issues not raised before the trial court "unless the questions so raised on appeal go to the jurisdiction of the trial court or concern matters of great public interest." Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973) (quoting Reynolds Offset Co. v. Summer, 58 N.J. Super. 542, 548 (App. Div. 1959)). We are not persuaded plaintiffs' counsel

accused Dr. Ricker of acting in bad faith and discern no reversible error on that point so as to necessitate a new trial on damages.

Defendants' remaining arguments—to the extent we have not addressed them—lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

On appeal, defendants have not challenged the amount of the jury award. The primary thrust of their contentions is that the trial court made erroneous evidentiary rulings pertaining to liability and proximate cause. Therefore, we need not vacate the amount of damages awarded by the jury, and remand solely for a new trial on liability and proximate cause.

Affirmed in part; reversed in part; and remanded for a new trial on liability and proximate cause only. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

33